WILSON v. DAY et al.

(Circuit Court of Appeals, Ninth Circuit. October 6, 1919. Rehearing Denied December 1, 1919.)

No. 3273.

1. DESCENT AND DISTRIBUTION ⬅84—PURCHASE OF PROPERTY BY ADMINISTRA-
TOR FROM DISTRIBUTEE.
    Rev. Codes Idaho, § 5543, providing that no administrator may purchase
    property of the estate he represents, or be interested in any sale thereof,
    *held* not to invalidate a purchase of property by an administrator from
    a distributee after his final report had been approved and by final dis-
    tribution the property had ceased to be property of the estate, although he
    had not at the time been formally discharged.

2. DESCENT AND DISTRIBUTION ⬅84—VALIDITY OF PURCHASE OF PROPERTY OF
DISTRIBUTEE BY ADMINISTRATOR.
    The purchase of property from a distributee immediately after distribu-
    tion by the former administrator of the estate will be closely scrutinized
    by a court of equity and be set aside at the instance of the seller unless
    the utmost fairness and good faith in the transaction are shown.

3. DESCENT AND DISTRIBUTION ⬅90(5)—VALIDITY OF PURCHASE OF PROPERTY
BY ADMINISTRATOR FROM DISTRIBUTEE.
    A finding that a transaction by which the owner of an interest in a
    mine, received from her husband's estate, sold the same to the late ad-
    ministrator, who was also part owner, was fair, that the purchaser was
    not chargeable with fraud or misrepresentation, and that the price paid
    was as near the value of the property as could be estimated considering its
    character, *held* supported by the evidence.

Appeal from the District Court of the United States for the North-
ern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit in equity by Mathilde Cardoner (Joseph R. Wilson, her execu-
tor, substituted as complainant) against Eugene R. Day and others
and the Hercules Mining Company, a mining partnership. Decree
for defendants (253 Fed. 572), and complainant appeals. Affirmed.

Ettienne P. Bujac, of Carlsbad, N. M., and Charles R. Brice, of Ros-
well, N. M., for appellant.

Chas. W. Beale and John H. Wourms, both of Wallace, Idaho, for
appellees Eugene R. Day and Eleanor Day Boyce.

John P. Gray, of Cœur d'Alene, Idaho, for appellee Harry R. Allen.

Isham M. Smith, of Seattle, Wash., for appellee Jerome J. Day.

James E. Babb, of Lewiston, Idaho, for appellee Harry L. Day.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. This is an appeal by Mathilde Cardoner
from a decree of the District Court of Idaho, dismissing the com-
plaint of plaintiff and refusing to cancel a certain deed of sale of
mining property made by appellant October 28, 1916.

The appellees, except Harry R. Allen, Edward Boyce, and the
Hercules Mining Company, are owners of undivided interests in
the Hercules mine and other properties in Idaho and are conducting
mining operations as the Hercules Mining Company under the laws
of Idaho. The appellee Eugene R. Day since 1912 has been manag-

ing partner of the Hercules Company and acted as administrator of the estate of Damian Cardoner throughout its administration. At the time of the submission to this court appellant disclaimed any relief as against appellee Allen.

Appellant was the widow of Damian Cardoner, who died in the Canary Islands in 1915. His entire estate, being community property prior to his death, was by probate proceedings distributed to appellant. Deceased also left one daughter. Eugene R. Day, administrator of the estate, filed his final account, and a decree of distribution was entered on October 11, 1916, and actual distribution was had on that day, and decree of final discharge of the administrator was made November 1, 1916. The complaint alleges that on October 28, 1916, after some preliminary conferences with one Allen, joined as defendant below, appellant conveyed by deed to Eleanor Day Boyce her entire interest in the Hercules and other mines, together with her interest in all property of the Hercules Mining Company, a partnership, together with certain real estate in the town of Burke, Idaho, for $370,-000; that the terms were $50,000 cash, and the balance in two weeks; that the $50,000 was paid as agreed and an escrow conveyance deposited in the bank; that Allen, alleged to be a friend of appellant, who had negotiated the sale, demanded and received $5,000 commission; that the transaction was consummated on November 14, 1916, when the balance of the purchase price was paid into the bank and the deed delivered to Mrs. Boyce; that Allen was in reality acting for the Day interests and persuaded plaintiff to dispose of her interest in the mine; that at the time of filing suit and at the time of the sale the Hercules property was worth not less than $20,000,000 and that it has a value of $30,000,000; that plaintiff was not informed as to the real condition of the mine, did not realize that she was conveying all her interest in the mine, and (on information and belief) that the cash on hand was greatly in excess of the amount claimed, and that thereby she was defrauded; that Eugene R. Day had been manager of the mine for some years, and appellant had confidence in him and his judgment; that. by reason of Day not disclosing to appellant the real facts about the value of the mine, appellant was defrauded; that appellant discovered her mistake in making the sale in December, 1916, notified the Days of her intention to rescind the sale, and tendered them the entire purchase price; that appellees declined to accept the tender and refused to reconvey.

The defendants substantially deny all equities in the complaint and deny any fraudulent intent or misrepresentations on the part of Eugene R. Day or Allen.

The issues largely narrow to the following principal questions: Was Allen Mrs. Cardoner's agent? Was he acting for Eugene R. Day in endeavoring to negotiate the sale? Did Eugene R. Day practice any fraud, or make any misrepresentations by way of concealment or otherwise upon Mrs. Cardoner relative to the value and possibilities of the mine? Was the sum paid for Mrs. Cardoner's one-sixteenth interest the reasonable value, or was it near to a fair and adequate consideration for the interest acquired?

The District Court found that plaintiff received $350,000 for the mine; that Allen acted as plaintiff's agent; that Allen was not in the employ of the Day interests; that he made no misrepresentation of facts and discussed with Mrs. Cardoner only possibilities and matters which furnished legitimate subjects for consideration; that at no time did plaintiff think Allen was representing the Day interests rather than hers; that Allen was designated as her agent by written instrument; that plaintiff paid Allen's commission without protest; and that he continued to act as her agent thereafter and was on friendly terms with her.

As to Day's relationship, the court found: That at the request of the daughter, with apparent approval of appellant, Day was appointed administrator of the estate and discharged his duties as such; that on September 27, 1916, he filed his final account; that the account was duly approved October 14, 1916, and the estate turned over to plaintiff; that the order formally closing the estate and discharging Day was not filed until November 1, 1916; that appellant stood upon the sale for two months and accepted the balance of the purchase price after November 1st, the date on which Day was discharged; that she approved the transaction and authorized delivery of the deed by the escrow holder; that in any ordinary business transaction plaintiff could not easily be deceived or overreached; that she consulted her attorney, who was thoroughly familiar with the mine and its workings and made no complaint to him or to other friends and interested persons.

The District Court gave much consideration to what was the actual value of the property at about the time plaintiff sold her interest, and after referring to the cost of extracting, treating and marketing ores, the uncertainty as to the price at which the product of the mine could be sold, the difficulty of valuing the present worth of ores in the earth, the peculiar conditions which existed by reason of the world war which was then in progress, concluded that the price paid approximated the reasonable market value of the interest of the plaintiff, and that the sum received "was probably as much as she could have obtained from any other source, and, in any view of the bearing of the question of value upon the issue here, an approximation of the true value is all that is required."

From the extensive record we make the following statement of appellant's testimony: Plaintiff said that she left Idaho for Spain in 1906 with her husband, who had been in the general merchandise business in Idaho; that he owned a one-sixteenth interest in the Hercules mine; that he never discussed the subject of the mine with plaintiff; that he died in the Canary Islands in 1915, leaving herself and one daughter his sole heirs; that the daughter returned to the United States in April, 1915, to look after the estate; that she applied for letters of administration to be issued to defendant Eugene R. Day, which was satisfactory to plaintiff; that plaintiff returned to the United States in April, 1916; that she knew nothing about the laws and customs of the state of Idaho; that her husband transacted all the business himself and she took no part in it; that she resided in

Spokane in 1916, but had to go away on account of asthma; that upon arrival from Spain she telephoned Mr. Day in an endeavor to make an appointment with him; that she could not see him that day, but went to Wallace two days later to see him; that she asked him for the statements regarding the condition of the mine that had not been received since the death of her husband; that he said they were not ready, but that he would send them; that he asked her if she wanted to sell her interest and she declined; that she did not see him again until August 3d in his office at Wallace; that she asked again for further statements, but that Day said he did not have time; that she told him she would like to send them to her daughter who was in Spain, and that he said he never would send the statements to Spain, and that he never did; that she received no statements after she arrived in Spokane in April, 1916; that after the visit in April he sent her an envelope which contained some statements of the mine figures, but that he made no explanation of them and she did not understand them at all; that Day told her he did not have time to make the statements, and that she did not receive any after she was in Spokane; that she went to Burke on the 4th of August to look over her property; that Day was to meet her in Burke to look at the property, but failed to do so; that she next saw Day on the 12th and 14th of October, in connection with the distribution of the estate; that she got her accounts from Day on the 14th; that she next saw him on the 28th of October; that he gave her a check for $5,000, but that he never gave her any information concerning the mine; that she had known Mr. Allen 20 years; that she saw him on the 23d of October, when he asked if she wished to sell the Hercules; that she told him she did not; that he told her the Days were "bucking" the Guggenheims, that the mine was not good any more, and that they would lose money because the Days did not have as much money as the Guggenheims; that they had some conversation about the lease and insurance on the house, and then he asked again if she did not want to sell her interest in the mine, and practically repeated the same statements he had made previously regarding the probabilities of the mine running out; that he told her the mine was worth about $5,000,000; that he figured out on paper what her share would be, and that she told him she did not want to sell; that she next saw Allen in Wallace on the 27th of October; that he came to see her the following morning and told her that perhaps after she left Spokane dividends would not be sent and that she might lose everything and advised her to sell; that Mrs. Wood and Allen said she might have litigation, that she had better sell; that Allen produced a "paper" (letter authorizing him to sell her interest in the mine for $312,500), which she signed; that she told Allen she thought the mine was worth more, and he said he would see if Mr. Day would not give more; that after discussing the transaction Mrs. Wood advised plaintiff to sell everything, including the real estate; that Mr. Day agreed to pay $5,000 more for the real estate, but refused to raise his price for the mine; that Allen said that the mine was not worth more than $5,000,000 and that was her share; that she was sick that day; that she signed the deed that evening; that they "made" her sign the

deed; that she did not read the deed; that they told her it was not necessary bceause "it was like the other paper from the time of the distribution of the property"; that she remarked to Day that she did not know whether she was wise to sell to him or whether he was wise in buying; that Day was present when the deed was signed; that he gave her two checks, one for $5,000 and one for $45,000; that the agreement was that in case the rest of the purchase was not paid in two weeks the $50,000 was to be forfeited; that the transaction was had in the evening after dinner; that Allen suggested that they go to the bank the following morning to deposit the deed; that it was Sunday, but they telephoned, and an officer of the bank (Vincent) met them at the depot in Spokane the next morning, and they proceeded to the bank; that when the conveyance was handed over Allen asked Vincent how much commission he should charge, and that Vincent answered he did not know, and that Allen claimed $5,000 and accepted the check for $5,000 which had been given by Day as part of the first payment of $50,000; that she was too sick to wait in Spokane two weeks; that she went to see Mr. Paulsen, an owner in the mine, and asked him if the Guggenheim rumor were true, and he said he thought not; that she had authorized Allen to collect her rents prior to the 28th of October; that thereafter he looked after her insurance and lease on the store; that after the distribution of the property she authorized Allen to sell some bank shares following the advice of Judge Wood; that Allen was sent to her by Day, and that she did not think she would have to pay a commission; that she left Spokane for Albuquerque, N. M., on the 6th of November; that she bought a house there; that she wrote for Mr. Wilson, an attorney who had been employed by her husband during his lifetime, to come from Philadelphia to see her as she was too sick to go to him; that he came in December, and that she told him of the sale of the mine; that he said she had not received enough for her share in the mine; that Mr. Wilson went to Spokane and ascertained that the mine was worth more than he had advised her it was worth; and that he returned to Albuquerque about December 18th.

Day testified, in substance, that Mrs. Cardoner frequently called upon him about April, 1916; that she told him of trouble she had had with her son-in-law and her daughter, and asked him to deliver any papers to her and to give her statements made by the Hercules Mining Company; that some statements had accumulated after the death of Mr. Cardoner, and that he gave these statements to her; that afterward she complained that there were some statements lacking; that he asked the chief accountant to make the statements for her, and that he gave them to the plaintiff, the last statement having been given to her in September, 1916, about the time of the winding up of affairs of the administration of the estate of plaintiff's deceased husband; that he turned over to her everything about October 14th, and delivered all the statements for each month for 1916, up to and including September of that year; that back in April, 1916, the plaintiff wanted to know about the mine; that he told her details, commencing with the matter of a mill in Wallace, and that he asked her to visit the property; that

he told her of changes since she had lived in Burke; that the upper levels of the mine were worked out, and that approach to the ore body was gained through a long tunnel known as the Humming Bird, and that this tunnel and property had been acquired in part from her husband, a large stockholder in the Humming Bird property; that he told her of the stock interest in the Humming Bird, described the condition of the mine, how it was largely worked out from the apex to the Humming Bird level, that the shaft had proceeded down from the No. 5 level and cut the vein on the 200, but that there was not sufficient work done to tell about the ore bodies at that time, and that the shaft was still being sunk; that good ore had been discovered, but how good and how much was not then ascertained; that he explained to her that the company owned many claims, much stock in outlying claims which had little value except by way of protection to the Hercules property; that mining stocks and smelter stocks had been purchased, and particularly that they had purchased a half interest in the Northport Smelting Company for $40,000 and a three-eighths interest in the Pennsylvania Smelting Company at a cost of $87,500; that they had gone into these smelting operations because they were no longer able to have an advantageous smelting contract renewed, and that the business was in better condition by reason of a connection with a smelter and refinery in which the company had a substantial interest; that he told plaintiff that he believed this was a wise business investment, and that she inquired particularly into this because she said she had heard her husband say that the company should keep out of the smelting business; that he referred to the ore in transit and told her that it would probably amount to $800,000 or a million dollars, and that she expressed doubt about tieing up so much money in the smelting business.

Day further testified that Mrs. Cardoner asked his opinion as to the future life of the mine below the Humming Bird tunnel, and that he told her, while the history of the country showed that the ore became baser as they went down, he believed that large bodies of ore would be discovered in new development below No. 5 level; that she asked how deep he believed they would have to go; and that he told her no one could say, and that the best opinions would be proved by the example of others who mined in the district close to that particular place. Day said that she called frequently at his office, often remaining from 45 minutes to 2½ hours; that she wanted to know particulars concerning the business, and that he gave her every bit of information within his knowledge; that he told her of all the operations in cutting a drift to the vein; and that he never concealed anything from her or misrepresented any fact.

Defendant Allen testified: That on October 14, 1916, after the decree of final distribution of the estate of Mr. Cardoner had been entered and a statement had been given to Mrs. Cardoner by Mr. Day, plaintiff took the papers to him (Allen) and went over them with him, asked for certain explanations, and requested him to look up some matters in connection therewith for her. These matters pertained to the Hercules dividends, certain insurance matters and certain bank stocks. That he was not the agent of Day and did not represent him in the

transaction in connection with the sale of the property. That he never had been an agent of Day or of Mrs. Boyce. That about October 16, 1916, Mrs. Cardoner told him of certain family troubles and wondered what she could sell her interest in the Hercules for. That he advised her not to sell, but that she was apprehensive lest her son-in-law might come from Spain and disturb the probate proceedings and gain control of certain of her property interests.

Allen further testified that plaintiff asked him to see what he could get for her interest in the Hercules, and said that Day might buy it and she wished him to find out what Day would give for it; that after he returned to Wallace he saw Day, told him what Mrs. Cardoner had said, and asked him if he was interested in acquiring her interest in the property; that subsequently he saw Day, who offered $275,000 for the interest of the plaintiff, but that he told Day that was not sufficient; that Day subsequently raised his price to $300,000, and that he told him that that was not enough; that Day told him there was about $600,000 in the bank and that he wanted to know if, in the event of purchase and sale, he (Day) would give Mrs. Cardoner her share of the cash, and that Day replied that he would think it over; that he saw Day again, and he said he would give her $300,000 for her interest in the mine and her share of the cash; that he reported to Mrs. Cardoner what Day had said, and told her that Day had said the only reason that he would consider buying was because it would give the Day family control; that he told Day that if he could not make a sale to him (Day) he would take the matter up with Paulsen and Hutton, who were also interested in the Hercules and in the American Smelting & Refining Company, and would try to get the top price; that on October 23d he went to see plaintiff, told her what Day had said, and, after a long discussion, plaintiff asked if Day would not give more; that he told plaintiff she should first make up her mind whether or not she wanted to sell, and that he would then try to have Day buy on the basis of a value of $6,000,000, and was satisfied that he could negotiate with Day on the basis of $5,000,000; that he showed plaintiff the two bases and explained what her interest would bring; that he advised her to talk with her partners who were in Spokane and to consult her attorneys and friends, and, if finally she wished to sell, to come to Wallace, and that it would not take long to get together and complete the transaction.

Allen said that plaintiff seemed worried about what her daughter would think of the matter, and testified that he went over the statements of the mine which he had, showing that it had paid something over $9,000,000, and had accumulated assets that would bring profits to $11,000,000; that he told her of different mines, some of which had been worked out, reminded her that the Hercules had gone into the new venture of a smelter, that there were chances in the lead market; that they would be in competition with the Guggenheims who controlled the price of lead to a great extent, and that she should consider these matters, but that he did not advise her to sell; that on the 27th of October he saw Mrs. Cardoner again and again they discussed the matter of sale; that he told her Day had refused to buy on the basis

of $6,000,000, but had finally agreed to pay $312,000 for the mine and its assets and to give her one-sixteenth of the cash on hand and to pay $15,000 for the Burke property; that Mrs. Cardoner said she would think it over and would meet him at the apartment of Judge Wood the next morning at 10 o'clock; that on the 28th he met her at Judge Wood's apartments; that he had an authorization with him for Mrs. Cardoner to sign; that she seemed satisfied with it, but she thought the Burke property was worth $20,000, whereupon Allen said he would again see Day; that he did talk with Day, and that Day agreed to give $20,000 for the Burke property, but refused to give more for the mine; that on that day he advised plaintiff to sell on the basis of $5,000,000, as he considered it a fair price, and told plaintiff why he thought so.

After delivering the escrow to an officer of the bank, Allen said there was some discussion as to what the commission should be, and that Mrs. Cardoner said, "Why, you are working for the Days, aren't you?" that he told her he was not working for the Days, but for her, and that, after submitting the matter to the bank officer, it was satisfactory to Mrs. Cardoner to pay $5,000, and she did pay him that sum by check. Allen denied that there was any understanding of any character between himself and Day, and asserted emphatically that he had first advised Mrs. Cardoner not to sell and then advised her to confer with the other partners and with her counsel, and that his advice to her to sell was after he had looked over the statements of the Hercules mine.

Judge Wood, a judge of one of the courts of Idaho and a former counsel of the plaintiff, testified that he did not hear the interview between Mrs. Cardoner and Allen, but that Mrs. Cardoner went to his room and asked him for his advice; that he refused to give it, but added that with his knowledge of the country and of the partnership affairs he had said to her:

"If I were owning that property and were offered that price, I think I should accept it."

Paulsen said that Mrs. Cardoner called upon him about October, 1916, and asked him about newspaper statements to the effect that the Guggenheims or the American Smelting & Refining Company were to absorb the Day interests in the smelters and mines for about $20,000,-000; that he told her that he had seen the article in the paper, but that she must disregard it, as there was nothing in it, and that even if the Guggenheims were "after" them the Hercules people could take care of themselves; that Mrs. Cardoner then asked him about the value of the property, and that he replied that there was a "good deal of guesswork connected with fixing the price of a mine in the state of development that the mine was in at that time," that the shaft level was getting pretty low, and that they did not have a great deal of ore exposed at that time; that she then told him some people wanted to buy her interest and asked what he thought about her selling. Quoting the testimony of the witness:

"I did not want to advise her, because if I advised her to sell I might make a mistake, and if I advised her to keep it I might make a mistake, so I

told her I thought my judgment would not be worth much to her. I didn't like to advise her. However, I said, 'My interest is not for sale,' and that is about all that was said."

Paulsen further testified that Mrs. Cardoner asked about dividends and wondered why there had not been dividends paid for the last few months, and that he replied that they had gone into the smelting business and were branching out and had to take care of those additional propositions and had a large amount of ore in transit which had not been settled for. Mr. Paulsen expressed the opinion that he did not give a great deal of thought to just what the value of the property, was at the time Mrs. Cardoner spoke to him, but that, after he ascer-tained what had been paid for her interest, "I felt that she got a good price for it." He added that he would not have been willing to pay any more for that interest than she received.

Mr. Hutton said that Mrs. Cardoner called upon him in the fall of 1916 and asked him what he thought the value of the mine was, and that he told her that, taking everything into consideration, the depth of the mine and all the equipment, smelters, and concentrators, he considered that $4,000,000 was a good price for it, and that he considered the sum paid to Mrs. Cardoner a fair price.

By what we have said it is very clear that the question of the relation of the price paid by Day to the value of the interest conveyed by Mrs. Cardoner became most important. Difficult as it generally is to reconcile the different views of men experienced in mining matters in their estimates of the value of mining properties, nevertheless it not infrequently becomes the duty of the courts to conclude from the evidence taken in the particular case whether the sum paid has true approximate relation to the value of the claim or property conveyed. This problem was interwoven with the present controversy.

As to the past history of the Hercules Mining Company, there were the statements which Day gave to Mrs. Cardoner. Among other details, they showed from month to month the aggregate amount of dividends that had been paid, the amount of net income received, the investments made by the partnership, the cash on hand, amount received from ore sales, and amount paid for operating expenses. For example, it was perfectly plain by the September, 1916, statement that the dividends paid up to October 1, 1916, amounted to $10,379,527.72; that investments in real estate, timber lands, smelting stocks, accounts receivable, cash deposited (all set forth by items), brought up the net income received to $12,019,128.04; that the cash received from January 1, 1916, to October 1st, for ore sales, was $2,861,304.61, which, with $11,755.34 for interest and discount, made receipts of $2,873,-059.95; that the operating expenses from January amounted to $1,069,-052.03; and that the net income for the period was $1,804,007.92. The difference between $1,804,007.92, or over $400,000 more than the $1,400,000 distributed in dividends and actual net profits, is shown to be due to the difference in amounts finally received on ore in transit at the beginning and close of such period. Settlements for ore in transit shipped up to October 28, 1916, did not appear because obviously there was no settlement for ore in transit prior to the close of the

month of October. The method of accounting was to treat this ore in transit, not as a distributive net income, but as an operative capital.

Mr. Allen thoroughly understood the statements, and, according to the testimony of Day, Mrs. Cardoner was told of the new arrangement concerning the smelting of the ores of the mine and was advised that there was a large amount of ore in transit and unsettled for.

Mr. Burbridge, a mining engineer of long experience in Idaho and Washington, testified in detail as to the valuation of the mine, based upon the development shown about the time of the sale by Mrs. Cardoner. The witness based his calculations upon the past history of the mine, personal investigation and knowledge of other mines, and the mining in ore chutes developed in tunnel No. 5. Based upon these estimates, the value of Mrs. Cardoner's interest at the time of the sale, including a one-sixteenth of the cash on hand and of the ore in transit, was $293,405, or $56,595 less than $350,000 which she received for the mine. The present value of a one-sixteenth interest of the total value was estimated to be $385,974. The payment of this sum in dividends, when spread equally over a period of 9.4 years, was found to be the equivalent of the payment of the whole sum at the end of 4.7 years. The witness took the present tax value as the sum which, at compound interest, would amount to $385,974 in 4.7 years and on a 6 per cent. compound interest basis deduced that it would be $293,405. In estimating depth of the mine, he was in part controlled by the data available concerning other mines in the vicinity of the Hercules, and he gave the history of several where profits ceased below depths of 1,800, 1,650, and 1,900 feet, respectively, and made his assumptions based upon productiveness of the ore remaining below ground as equal to the yield of the ground that had been worked out. He took the profits realized and the average operating cost between 1908 and 1912, when prices were regarded as normal for lead and silver, labor, and other operating conditions. In the five years, 1908–1912, inclusive, the profit per ton of ore mined averaged $3.37.

It is urged that the estimates of Burbridge are not entitled to the greatest respect because he did not carry them up to the period of 1916 when the price of lead was higher than normal. The witness said that in that time there were two boom periods when lead was higher than normal, and that it was probable, in his opinion, that after the war was over prices for lead and silver would be lower. He estimated that upon a remaining tonnage of 1,575,600 tons to last 9.4 years at a value of $2.50 to $3 per ton, there would be, say, $4,726,800. To this he added cash on hand on October 28, 1916, $649,359, and by including the ore in transit as worth $1,048,864, and adding thereto accounts collectible, $29,400, he arrived at a total of $6,454,423. From this he deducted the amount due to a smelter, $278,838, which left an estimated value of $6,175,585 for the Hercules property as of October 28, 1916.

It is true that the calculations of Mr. Greenough, who is also an educated and experienced mining engineer and testified for the plaintiff, conflicted in many respects with the opinions and deductions of Mr.

Burbridge. The lower court accepted Burbridge's evidence as of greater weight, and it is evident that Mr. Greenough was not nearly as familiar with the conditions and veins in mines in the vicinity of the Hercules as was Mr. Burbridge. Furthermore, Mr. Greenough based his estimates of value ($10,750,000) upon the hypothesis that as the ore bodies went down there was a greater value than seems warranted, considering the evidence that as the work was carried down the ore bodies became somewhat baser, with more zinc and a gradual decrease in the silver ratio.

[1] Advancing now to the principles to be applied in the disposition of the rights of the parties, it is important to remember that prior to the time that Day and the plaintiff began to negotiate for purchase and sale, the property involved had been ordered distributed by the proper court sitting in probate within the state of Idaho, and that in pursuance of the decree of such court the property had been turned over by Day as administrator. It appears, however, that the formal order of discharge of Day as administrator was not entered until November 1, 1916, or several days after definite agreement of sale had been made. But it is clear that the right of possession of the property here involved passed from the administrator to Mrs. Cardoner upon the entry of the decree of distribution; and by the statutes of Idaho (sections 5626 and 5627) the order or decree of distribution was as to such property conclusive as to the right of the plaintiff subject only to be reversed or set aside or modified on appeal. Therefore, from the time of the delivery to Mrs. Cardoner as required by the decree, Day, as administrator, had no possession of or control over the specific property so turned over and all such property so released from his control ceased to belong to the estate of the decedent. The administrator may not have been formally discharged from his trust, but the property delivered pursuant to decree passed out of the jurisdiction of the court in probate proceedings unless to compel delivery. Buckley v. Superior Court Cal., 102 Cal. 6, 36 Pac. 360, 41 Am. St. Rep. 135; Wheeler v. Bolton, 54 Cal. 302; Moore v. Lauff, 30 Cal. App. 452, 158 Pac. 557. Section 5543 of the Idaho Revised Code, which provides that no administrator must directly or indirectly purchase any property of the estate he represents and that he must not be interested in any sale, is not applicable, because, as we have said, the property distributed belonged to the plaintiff, and as a result after distribution was not the property of the estate which the administrator represented. This we believe to be the correct legal view of the relationship of the appellee Day to the property when he agreed to buy it, and, in our opinion, after distribution Day was not in the legal position of one purchasing property of the estate he represented. We are satisfied that the Idaho statute cited cannot be invoked as a ground for declaring the sale void and invalid at law.

[2] On the other hand, a court of equity in considering the evidence will not weigh with great nicety at what precise time Mr. Day was legally absolved of obligation to his trust as administrator, but will carefully weigh the case as one where the conduct of Day and Allen and all the circumstances of their dealings with each other and with

Mrs. Cardoner must be subjected to the closest scrutiny, and upon the principle that Day held a fiduciary relationship and that, unless he has shown that he dealt with Mrs. Cardoner with entire fairness and absolute candor and with scrupulous integrity, the sale will be annulled. Day had been administrator of the estate of Mr. Cardoner and was a partner in the mines here involved, and well knew the mining properties and was able to judge of their probabilities. He knew that Mrs. Cardoner trusted him as administrator and that naturally she would seek information as to the condition of affairs from him. He knew practically all that could be known about the mines, and as a partner, by reason of having just theretofore had charge as administrator, he was bound by every rule of honor to give to her all the knowledge he possessed, and not to conceal or omit to make full disclosure.

[3] By these standards we have tested his conduct, and our carefully formed judgment is that the findings of the learned judge who tried the case are sound and right, and that there is nothing whatever to justify any well-founded belief of combination between Day and Allen, and that when the suggestion of a combination between those two is dispelled, and the conduct of Day is closely examined, it appears that he gave to the plaintiff all the knowledge that he himself had of the conditions and possibilities of the future of the mine, of the smelting venture, of the ore conditions, of the ore shipments, and of all other matters upon which she could base an intelligent judgment of the value of her interest. Furthermore, Allen, acting for Mrs. Cardoner, made a study of the statements which Day gave to Mrs. Cardoner, explained them to her, and at her wish solicited Day's interest as a buyer and, after dickering with Day by and with the knowledge of plaintiff, agreed upon terms even to the last debated point of the price for the real estate in Burke.

It is evident that Mrs. Cardoner was a woman of capability and intelligence with more than an ordinary acquaintance with the business of her husband. She had taken necessary steps to defeat the will which her husband had made, and even as far back as 1903 in a proceeding in court she made a statement as to the income of her husband and had recapitulated his mining interests, alleging them then to be of an estimated value of over $2,000,000. It is also shown that, after the administrator turned the property over to her, she herself checked some of the accounts, and, upon discovering a slight discrepancy, asked her agent, Allen, to investigate them. Furthermore, she was not satisfied about selling her interest in the Hercules until she sought the advice of Judge Wood and had conferred with several co-owners in the property. Nor did she agree to sell until after her extended conferences with Allen. Among other circumstances of much weight is the following incident as testified to by Allen: After discussing with plaintiff what a sale on the basis of $5,000,000 would yield to her, he said:

"* * * And then we talked over the Burke real estate and she wanted to clean—she wanted to clean up on her holdings up there in the Coeur d' Alene country, for the reason that she was afraid that this son-in-law would cause her some trouble. I remember a discussion there—she always talked at our home—on dividing the interest in the Hercules with her daughter. And I

asked her about that, and she said: 'Well, if I leave that interest, Pauchet (the son-in-law) will get hold of that and Bertha (the daughter) won't have any good of it. If I take the money for it I can get the money out of their way so that he cannot get his hands on it.' I said, 'Supposing they upset the proceedings of the probate court?' 'Well,' she said, 'I will have my money then. I don't care.'"

This evident desire to "clean up" in the Cœur d'Alene country is also shown by the fact that she took steps to sell her stock in the Wallace Bank & Trust Company which was part of her inheritance from the estate. Allen acted for her in the sale, collected the proceeds, and forwarded them to her on October 19, 1916.

Again, there is the fact that after November 1st, when Day was wholly discharged as administrator, and for over two months thereafter, Mrs. Cardoner made no objection to the sale she had made, and it was after November 1st that she accepted the greater amount paid on account of the purchase price, and thereby gave approval of the transaction and authorized the holder of the escrow deed to deliver it to the grantee, Eleanor Day Boyce.

We also attach significance to the evidence of Mr. Allen, showing that he had a number of meetings with Day during the dickering about the price, "boosting him up," until Allen finally said that if he could not deal with him (Day) he would probably take the matter up with certain other parties who might be interested in it. This evidence harmonizes with that given by Day, who says that he told Allen that, if Mrs. Cardoner thought she ought to get at the rate of $6,000,000 for her interest, he would not pay it, and that if there were other buyers they could take it at that price.

It is fair to say that there were decided conflicts between the testimony of Mrs. Cardoner and Mr. Day. The District Court, however, has resolved the differences in favor of Mr. Day's versions as to material matters; and after analyzing what the witnesses said and weighing all that was done by the parties themselves, including Allen, we are convinced that the conclusions reached are supported by the weight of evidence. A careful study of the whole case leads us to conclude that the plaintiff, an elderly woman, was somewhat apprehensive concerning family affairs, and, not at all unnaturally, wished to convert her property interests into available cash in bank. Of her own volition she sought the advice, not of one, but of a number of those whom she knew and in some of whom she confidently trusted. The character of the principal part of her property and the difficulty of estimating its value appear to have made her friends and others to whom she went exceedingly careful in giving her counsel, and all appear to have advised or conferred with her in the best of faith and with no wish other than to be fair and frank. Possessed of all the knowledge that her friends and advisers and partners had and could give her, she thought it wise to sell for the sum offered, which, under the evidence, appeared at the time to be fair and just and was as near the value of the property as could be well arrived at. In our opinion she has advanced no sound reason why equity should relieve her of her contract.

The decree is affirmed.