ARKWRIGHT et al. v. GONSER et al.

No. 6621.

Circuit Court of Appeals, Ninth Circuit.

June 24, 1932.

Lucius G. Nash, of Spokane, Wash., Clinton J. Wall and Elmer T. Phillips, both of Youngstown, Ohio, and F. C. Highsmith, of Spokane, Wash., for appellants.

David R. Glasgow and Hamblen & Gilbert, all of Spokane, Wash., for appellees.

Before WILBUR and SAWTELLE, Circuit Judges, and ST. SURE, District Judge.

SAWTELLE, Circuit Judge.

L. W. Hutton and Mary Arkwright Hutton, husband and wife, owned, as a community, practically a one-tenth interest in properties owned by the Hercules mining copartnership, in the Cœur d'Alene district, Shoshone county, Idaho. From the profits derived from their part ownership in the Hercules properties, the Huttons purchased valuable holdings in Spokane, Wash.

Mrs. Hutton died on October 6, 1915. Her will, dated December 2, 1913, was probated in Spokane county, Wash., where the Huttons were domiciled. Her husband was named as her executor. The will contained the following paragraph: "Sixth. All the rest, residue and remainder of my estate both real and personal, wherever situated, I give, devise and bequeath to my husband, L. W. Hutton, with full power to use, retain, hold, manage, invest, and keep the same invested, and receive and retain the rents, issues and profits thereof for and during the term of his natural life, if he should so long remain my widower, and upon his re-marriage or death, or in case he shall not survive me, I give, devise and bequeath to the said Eliza Grombacher, to the said Lyman B. Arkwright, to the said Delan[n]y Arkwright and to the children of the said William Arkwright each an undivided one-fourth part thereof, absolutely and in fee."

The defendants-appellees admit that at the same time Mrs. Hutton made her will, her husband executed his own will, containing analogous provisions, whereby he left his wife a life estate in his property, with remainder over to his brothers and sisters.

Ancillary probate of Mrs. Hutton's will was had in Shoshone county, Idaho.

The complainants below, the appellants herein, are the sons and daughters of Lyman

B. Arkwright, Delanny Arkwright, and William Arkwright, named in the extract from the will quoted above.

In their answer, the defendants-appellees admitted that L. W. Hutton represented, in the ancillary proceedings in the Idaho probate court, that, according to the statutes of that state, Mrs. Hutton did not have the right to bequeath her community property to the appellants, and that, there being no children from the marriage, Hutton inherited all the decedent's share of the community property in Idaho. The appellees further admitted that the above representation was partly incorrect, in that they have later learned that the personal property of the community was subject to be disposed of by will by either spouse without restriction.

A number of objections to the final settlement of account and the distribution of the estate were filed by the present appellants, through their attorneys, in both the Washington and the Idaho courts. In the picturesque language of Frank T. Post, one of the attorneys for the appellants in the probate proceedings, some of the papers filed on behalf of the appellants were of a "pestiferous" nature. We advert to this fact as indicating that the appellants were at least vigorously and energetically represented in those matters. Indeed, the learned District Judge who tried the present case found that there was "nothing here to cast the slightest suspicion upon the fidelity" of the Arkwrights' attorneys "in the performance of their duties to their clients," and he further found that "there is no doubt of their ability." We therefore accept it as a fact that the appellants were well represented in the probate proceedings.

Among other objections filed by the appellants herein to the proceedings in the Idaho court was that the executor, Hutton, had "fraudulently omitted from the inventory by him heretofore herein filed each and every item of personal and real property owned by the estate of the said deceased, and by said deceased with the said L. W. Hutton as a community," etc.

Petitions for "construction of will" were filed both in the Washington and in the Idaho courts.

Planning to endow with his fortune the Hutton Settlement, an eleemosynary institution established by Hutton near Spokane for the purpose of conducting an orphanage, Hutton "consented," according to the appellee's answer filed in the court below, that one Russell F. Collins should go to Ohio during the latter's trip east, and "confer" with the remaindermen, who were the appellants herein and their ancestors. The appellees admit that Collins, in asking Hutton's consent, offered to endeavor to assist in negotiations for the purchase by Hutton of the remaindermen's interest in Mrs. Hutton's estate.

There is considerable conflict in the testimony as to Hutton's part in the trip made by Collins, and also as to the representations made by the latter to the remaindermen, two of whom were old men in necessitous circumstances. We will discuss this phase of the case more fully hereafter.

It is admitted that in July, 1917, and in December, 1917, Collins did visit the remaindermen in Ohio and did make certain representations to them, tending to convince them that it was advisable for them to enter into a settlement with Hutton.

On May 2, 1917, a decree of settlement of account and final distribution was entered in the Idaho court. A notice of appeal from that decree was filed on behalf of the Arkwright heirs on June 29, 1917.

On January 16, 1918, the remaindermen sold and deeded to Hutton all their interest in the estate of Mary A. Hutton for $175,000. No money was paid and no deed was transferred, however, at that time.

On March 7, 1918, a stipulation was entered into between the parties, agreeing to the dismissal of the appeal from the order, judgment, and decree of settlement of final account and the decree of final distribution in the Idaho court, with prejudice; and, pursuant to such stipulation, a judgment of dismissal of the appeal was entered the same day.

On April 22, 1918, pursuant to a stipulation between the parties, an order was entered for the dismissal of the amended petition for construction of will in the Spokane court.

On July 11, 1918, a decree of distribution in the matter of the estate of Mrs. Hutton was entered by the Spokane court.

Appellants concede that "no money was to be paid" under the settlement between Hutton and the remaindermen until Hutton had technically "divested himself of his garments as executor and trustee." They contend, however, that the "contract was fully executed during Hutton's trusteeship."

Section 7655 of the Idaho Compiled Statutes for 1919 provides: "No executor or administrator must, directly or indirectly, pur-

chase any property of the estate he represents, nor must he be interested in any sale."

The Idaho decree of distribution settled and approved Hutton's "first and final account" as executor, awarded him a life estate in the residue of the separate property of Mrs. Hutton, under the will, and gave him the residue of the community property of the estate absolutely and in fee, to the latter of which the court held that Hutton was "by law entitled." The separate property of the Idaho estate consisted solely of one-half interests in two Idaho mining claims. All the rest of the estate was community property.

The Washington decree distributed to Hutton all the residuary property of the estate. The decree held that all the property in Washington was community property, and recognized the settlement made between Hutton and the remaindermen.

The appellees admit that, after the decease of his wife, Hutton made a new will, "cutting out his own brothers and sisters as remaindermen in his will, and leaving his entire estate to the Hutton Settlement." The appellees deny, however, that any stipulation in the contract made between the spouses for the making of mutual wills or any provision of Hutton's will, made pursuant thereto, was for the benefit of the appellants, who were, it is asserted, in no way "disappointed" in Hutton's new will.

Hutton died November 3, 1928. The Hutton Settlement accepted the devise of the estate, and "entered upon its administration in aid of the charity for which it was organized."

The present suit was filed February 17, 1930. Petitions attacking Hutton's will, however, were filed by the present appellants in the Spokane court on May 6, 1929, and on June 12, 1929, the second being an amended petition.

The court below found that the "agreement" between the Arkwrights and Hutton "was made without fraud being practiced to procure it by L. W. Hutton, and that the said settlement was fair and just, and for an adequate consideration, and made by the plaintiffs and their ancestors with full knowledge of all the facts necessary to advise them of their rights." Accordingly, the court ordered the bill of complaint to be dismissed.

From that judgment the complainants below have appealed.

There are two controlling questions to be decided in the instant case: First, was the settlement fair and just; and, second, if it was not, are the appellants entitled to attack it at this late date?

Addressing ourselves to the first proposition, we are impressed by the fact that the remaindermen were represented by three able attorneys, one in Idaho and two in Washington, who energetically defended their clients' rights, to the extent, in the words of one of the attorneys, of filing "pestiferous" papers. The appellants' lawyers in Ohio, in Washington, and in Idaho personally made investigations of the value of the properties involved, and of the appellants' rights thereto.

The litigation, in the words of the learned jurist who tried the case in the court below, involved "rights under circumstances fraught with perplexities almost without precedent." We are not here called upon to adjudicate the questions presented in the Idaho and Washington courts; we merely have to inquire whether or not the issues involved and the pertinent questions of law were, indeed, "many and complex," as the District Court found. From the foregoing brief statement of fact alone, it will readily be seen that the litigation did present some troublesome questions; questions that wise and prudent men might readily prefer to settle out of court in fair compromise, rather than to submit them to the hazardous arbitrament of law. Practical men usually prefer certainties to uncertainties. As John P. Gray, a lawyer of Cœur d'Alene, Idaho, who testified in this case, observed, "There is some hazard in litigation."

Particularly applicable are such reflections when directed to a case where old and necessitous men are seeking to acquire some funds wherewith to solace the evening of their lives. The aged remaindermen saw before them a life tenant with an admitted expectancy of 16.05 years. It might readily be understood why they would prefer, at their age, to realize upon their share in the estate at once. It might readily be conceived that they would not care to wait 16 years for their inheritance, lest Death bar their entrance into the manor.

Much has been said by the appellants regarding the visit of Collins at the home of the remaindermen. It may be conceded that Hutton erred in consenting that Collins should call on the Arkwrights in an effort to bring about a settlement. An executor, dealing individually with the heirs with reference to property belonging to the estate, should avoid not only evil, but the appearance of

evil. Indeed, the statute of Idaho, quoted above, is quite explicit on the subject.

Under all the circumstances, however, we do not believe that Collins misled the remaindermen in any material respects. Most of his arguments, as to the remaindermen's age, Hutton's expectancy, the hazards of mining and of litigation, the law of Idaho as to the power to bequeath community property, were thoroughly legitimate. But more important than anything else is the fact that the remaindermen did not have to rely upon Collins' statements, when their own attorneys gave them advice nearly parallel to his.

One of these attorneys, Emil J. Anderson, of Youngstown, Ohio, who had charge of "this litigation" for the appellants, visited Spokane in the summer of 1916, according to his partner, Clinton J. Wall. Anderson made a personal and independent investigation of the facts in the case. While in Spokane, he wrote the following letter to Hutton:

"As you will be informed at your office, the writer came here at the request of the Youngstown relatives of Mrs. Hutton, for the purpose of making a brief examination of matters pertaining to her estate.

"At the time I left, no word had been received from you or your office—their only information coming from outside sources. And naturally it appeared a little strange to them that you had failed to write them in so many months.

"Both Lyman and Delaney Arkwright are men well up in years, and the hardships of travel seemed so great that they determined to send a representative. Therefore, it is a matter of keen regret to me that I have failto to meet you personally. For I was very anxious to explain to you the attitude of my clients, which cannot be done very satisfactorily by letter. However, we do want you to understand clearly that we appreciate your position, and want to co-operate in carrying out Mrs. Hutton's will in spirit as well as in letter.

"And in my brief stay, I have learned over and over that you bear the best kind of reputation in your community for everything that is honorable and upright. Also that Mrs. Hutton was probably not only the most beloved woman in Spokane, but in the entire Northwest. In fact, it seems marvellous to me, what an influence for good you folks really exerted.

"I have looked into the Spokane appraisement, and feel that it is very fair indeed.

"Mr. Luby [of Luby and Pearson, of Spokane, attorneys for Hutton] discussed matters with me, and Mr. Crawford showed me marked consideration under the circumstances, for which I am thankful.

"But, when I failed to see you, I felt it necessary to establish relations with some local representative, and have taken matters up with Attorney Wm. A. Monten, in the Paulsen Bldg. But, made it clear to him that we want to co-operate, and not to embarrass you in any way. So, if any question arises, it can be communicated through this channel.

"Hoping to make your acquaintance in the future, I am

"Yours respectfully,

"[Signed] Emil J. Anderson."

We have quoted this letter in full to show that as early as July 28, 1916, the date of the letter, the present appellants and their ancestors had their own legal representative investigating the Mary A. Hutton estate and their legal rights thereunder. The letter also indicated that at that time, at least, their representative was unable to find traces of the fraudulent and unscrupulous dealings with which Hutton is now charged.

It is extremely unlikely that the Arkwright heirs, well furnished with legal advisers, relied upon vague remarks of Collins, an utter stranger to them.

There is testimony that Hutton gloated over the way in which he had "skinned, jipped and beat out" the remaindermen. We are frank to say that we do not attach much credence to such testimony. As the lower court pertinently observed, "men who perpetrate fraud for the purpose of profiting by it do not proclaim the fact that they have perpetrated it, from the housetops, and make it possible to undo the job that they have been so successful in bringing about."

Courts of law are not obliged to believe testimony that is inherently improbable; especially when it purports to quote the language of a man whose lips are now sealed in death. As was said by the Supreme Court in Lea v. Polk County Copper Co. et al., 21 How. (62 U. S.) 493, 504, 16 L. Ed. 203, "courts of justice lend a very unwilling ear to statements of what dead men had said."

In Easton v. Brant et al., 19 F.(2d) 857, 859, the late Judge Rudkin, of this court, said:

"'Uncontradicted evidence is not, however, necessarily binding on the court or a jury, but may be disbelieved where it is contrary to the natural or physical laws, opposed to

common knowledge, inherently improbable, inconsistent with circumstances in evidence, or somewhat contradictory in itself, especially where the witness is a party interested, or where, in the very nature of things, it is impossible to secure opposing testimony.' 23 C. J. 47.

"This is especially the case where an attempt is made to establish a trust as against the estate of a decedent. [Quoting from the Lea Case, supra.]"

See, also, Jones et al. v. Jones et al. (C. C. A. 9) 35 F. (2d) 943, 945.

We next advert to the question of laches. As will be observed from the foregoing statement of facts, the appellants waited a dozen years before bringing their suit. The delay is not satisfactorily explained, either in the pleadings or in the proof. And, as the lower court pointed out, during the twelve years that have elapsed, several of the persons intimately connected with this litigation have died.

In paragraph XIX of the amended bill of complaint are found the following allegations:

"That relying implicitly and confidently on the representations of Collins and his principal, and residing in a distant state and not being put on guard against them, not knowing or having the means of discovering that Collins was the agent of said Hutton and likewise that their interest in the estate of Mary A. Hutton was not confined to her estate in the State of Washington and in this district and believing her estate to be relatively small, and having no knowledge or means of discovering the false and fraudulent practices resorted to in said probate courts and all the allegations of this bill; that complainants were not put on inquiry until some time after Hutton's death when they were informed of the magnitude and value of the estate left by him and did not know of the facts alleged in this bill until a few months prior to its filing and that certain litigation which was commenced in the state courts of this state about six months ago by Hutton's heirs at law against the defendant named herein; that had complainants been fully advised of the nature, character, value and the amount of the estate of Mary A. Hutton, deceased, and had not been deceived by the said Hutton and his agent, they would not have agreed to sell and convey their rights in and to said estate to said Hutton for said sum. * * *

"XXI. That complainants now having ascertained the true facts as to their said interests and having discovered the fraud practiced on them as herein alleged, that they do now elect to rescind the said contract made January 16, 1918," etc.

Mrs. Rachel Arkwright, testifying on behalf of the appellants, quoted Collins as saying to her father-in-law, Lyman B. Arkwright, one of the remaindermen, that Arkwright and his relatives "will be remembered by Mr. Hutton later on." Mrs. Ina B. Simpson, a daughter of Lyman Arkwright, testified that: "We certainly did have an idea that we were to get something out of that estate because—with the impression that Mr. Collins left when he returned west; the impression that he left was that we would be remembered at his death." Again Mrs. Simpson testified that "my relatives, my father and brothers got the one hundred and seventy-five thousand dollars part settlement."

Mere vague expectations that they would be "remembered" by Mr. Hutton did not justify their waiting twelve years before complaining of the settlement. Indeed, it may be that this very disappointment of their hopes has suddenly caused them to become so critical of Hutton's administration of his wife's estate.

Nor, in view of their lawyers' previous and independent investigations, are we greatly impressed with the testimony now offered on behalf of the appellants, to the effect that they learned of the vastness of Hutton's estate, and of their legal rights therein, only after his death.

The objections and petitions filed by the Arkwrights' attorneys in both courts, as far back as 1917, clearly demonstrate that the remaindermen were then claiming that Hutton had not inventoried all the assets of Mrs. Hutton's estate, that her estate was in reality worth millions, and that Hutton had been guilty of fraud.

In the "Objections to the first and final account and * * * petition for distribution," filed by the Arkwrights in the Idaho court on March 17, 1917, the following allegations are found:

" * * * Your objectors are informed and believe and therefore allege that the said appraisers knew that the 25/256 interest of the said deceased and the said L. W. Hutton as a community in the said partnership was of a very high value, to-wit: of the approximate value of $4,000,000.00; but that for some reason, the exact nature of which

is to your objectors at this time unknown, the said appraisers did not desire to appraise the estate of the said deceased in the said partnership proportionally higher than the sum at which an interest in the estate of ————— Cardoner in the said partnership has previously been appraised in this Court."

"That the said properties of the said partnership at the time of the death of said decedent were and now are of the value of upwards of $40,000,000.00, as your objectors are informed and believe and therefore allege upon such information and belief, and that the value of the interest of the said community composed of the said deceased in her lifetime and the said L. W. Hutton, was at the moment of her death and now is of the value of upwards of $4,000,000.00."

"Your objectors further object that the said L. W. Hutton, as executor in this Probate Court of Shoshone County has failed and neglected to pay any of the debts of the said community, any claims against the said estate, and any charges of administration, out of such portion of the estate of the said deceased as lay in Idaho at the moment of her death, and which lies in Idaho now, as by law required, and that the debts of the said estate, the charges of administration of the estate in Washington and Idaho, and the claims against the said estate in Washington and Idaho, to date exceed the sum of $190,000.00, no portion of which has been charged to the estate in Idaho;

"and in this connection your objectors allege that the said L. W. Hutton is seeking to defraud these objectors and the other legatees, beneficiaries and devisees of the will of the said deceased in common in the sum of upwards of $190,000.00, and pray[s] this court by its proper orders to compel the said L. W. Hutton to disclose item by item the debts, claims and charges above referred to unto this court."

Again, on April 24, 1917, the Arkwrights filed a "supplemental petition" in the Spokane county superior court containing the following charges against Hutton:

"3. That the said reply discloses that since the filing of the said final account and prior hereto the said L. W. Hutton has refunded and repaid out of his personal funds unto the Executor of said estate in the State of Washington, the sum of $1191.47, which sum petitioners say the said L. W. Hutton improperly and fraudulently paid out of the Washington estate, if it be held that said L.

W. Hutton be entitled to any part of the estate of said deceased in Idaho in fee.

"4. Your petitioners allege that said L. W. Hutton is irreconcilably hostile to petitioners, that he is hostile to any interference of this court with his pretended administration in Idaho, that his previous acts in the court of his administration of the estate in both the State of Idaho and the State of Washington shows that he will not continue to administer the estate in either State as by law required, that he has breached his trust, that he has injured the estate and these petitioners and will continue to do so unless removed by the court, and that pursuant to section 1444 of Remington & Ballinger's Codes and Statutes of the State of Washington he has subjected himself to, and this Court should order his removal as executor under the will of said deceased; and that the further administration of this estate should proceed in the regular way, and not as provided for in the case of non-intervention will administrations properly conducted."

Additional allegations as to the high value of the estate of Mrs. Hutton were made by the remaindermen in the "amended petition for construction of will, for removal of executor, and for an accounting," filed in the Spokane court on September 22, 1917: "That the said Mary A. Hutton and husband and the said other owners as tenants in common at the time of her death, and for many years prior thereto, extracted lead and silver ores from the said Hercules Mine, and that said Hercules Mine was a very rich producer so that, to-wit, the net profits from the operation thereof to the said owners at, or about, the time of the death of the said Mary A. Hutton was at the rate of approximately two hundred and fifty thousand dollars, ($250,000.00) per month, which rate of net earnings was maintained after the death of the said Mary A. Hutton and up to the 1st day of January 1917, at about the same rate, and your petitioners are informed and believe that the same rate of net earnings has ever since been and is being maintained; and that the said Mine can not at the present rate of mining be exhausted within a very great number of years."

These and other allegations, too lengthy to set out in extenso, clearly indicate that the parties were dealing with one another at arm's length as far back as 1917. The alleged discovery of the real value of the Hercules mine was nothing new, in view of the allegations just quoted. Nor does such al-

leged discovery account for the failure of the remaindermen to attack the settlement during Hutton's lifetime, because the pleadings filed in the state courts in 1917 alleged that he was guilty of fraud in turning in his inventory of the property, and in failing to charge the Idaho estate with debts amounting to about $190,000. The remaindermen also alleged, as we have seen, that the mine was netting $250,000 per month, that it was of great value, that the profits were then being maintained, and that it would be a great many more years before the mine would be worked out.

With this knowledge of the lawyers as to value, which, of course, is knowledge of their clients, the attorneys for the Arkwrights recommended the settlement, and it was made accordingly. In justice to those lawyers, it might well be said that they doubtless took all the facts into consideration—the hazards of a lawsuit, Hutton's life expectancy of 16 years, as stated above, the difficulty or even impossibility of predicting, with any degree of certainty, the life of a lead-silver mine or how long it would continue to be operated at a profit, to say nothing of the desire of the appellants' ancestors to reap for themselves the benefits from the property, instead of leaving it entirely to their children to enjoy.

The case of Wilson v. Day et al., 260 F. 788, 800, decided by this court, involved a one-sixteenth interest in the same Hercules mine. In that case, Mrs. Mathilde Cardoner received $350,000 for her interest. The concluding language of the opinion, delivered by Judge Hunt, is particularly apposite here: "A careful study of the whole case leads us to conclude that the plaintiff, an elderly woman, was somewhat apprehensive concerning family affairs, and, not at all unnaturally, wished to convert her property interests into available cash in bank. Of her own volition she sought the advice, not of one, but of a number of those whom she knew and in some of whom she confidently trusted. The character of the principal part of her property and the difficulty of estimating its value appear to have made her friends and others to whom she went exceedingly careful in giving her counsel, and all appear to have advised or conferred with her in the best of faith and with no wish other than to be fair and frank. Possessed of all the knowledge that her friends and advisers and partners had and could give her, she thought it wise to sell for the sum offered, which, under the evidence, appeared at the time to be fair and just and was as near the value of the property as could be well arrived at. In our opinion she has advanced no sound reason why equity should relieve her of her contract."

In Pomeroy's monumental treatise on "Equitable Remedies," 1905, vol. I, § 36, page 62, we find the following lucid statement of the rule for "Pleading Excuses for Laches": "The party who appeals to the conscience of the chancellor in support of a claim, when there has been laches in prosecuting it, or long acquiescence in the assertion of adverse rights, should set forth in his bill, specifically, what were the impediments to an earlier prosecution of his claim, how he came to be so long ignorant of his rights, and the means used by the respondents to fraudulently keep him in ignorance; and how and when he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor must refuse to consider his case, on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer."

Aside from the lack of particularity in pleading, however, we believe that the appellants have failed to prove justification for their laches, or acquiescence in the Hutton Settlement's assertion of adverse rights. In Sullivan v. Portland & Kennebec Railroad Co., 94 U. S. 806, 811, 24 L. Ed. 324, we find the following language: "To let in the defence that the claim is stale, and that the bill cannot, therefore, be supported, it is not necessary that a foundation shall be laid by any averment in the answer of the defendants. If the case, as it appears at the hearing, is liable to the objection by reason of the laches of the complainants, the court will, upon that ground, be passive, and refuse relief."

See, also, with regard to the proper attitude of an equity court toward laches, Abraham v. Ordway, 158 U. S. 416, 420, 15 S. Ct. 894, 39 L. Ed. 1036; and Wagner et al. v. Baird et al., 7 How. 234, 257, 258, 12 L. Ed. 681.

We have carefully and critically examined the voluminous record, exhibits, and briefs, and we do not believe that the appellants have made out a case that should appeal to the conscience of an equity court. In reaching this conclusion, we have borne in mind the classical admonition of Mr. Chief Justice Fuller, in Hammond v. Hopkins, 143 U. S. 224, 274, 12 S. Ct. 418, 435, 36 L. Ed. 134: "In all cases where actual fraud is not

made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hourglass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused."

Judgment affirmed.