985 F.2d 1232
 Fed. Sec. L. Rep. P 97,344
 Louis WALTER; Lance Walter, individually, as Trustee of the
testamentary trust created under the Will of Manuel Walter
for the benefit of Toni Walter Stern, and Executor of the
Estate of Manuel Walter; Toni Walter Stern; the Walter
Company, a California general partnership; Herbert Sturman,
individually and as Executor of the Estate of Harvey
Fierstein; and Paul Syphus,
v.
HOLIDAY INNS, INC.; Harrah's New Jersey, Inc.; Harrah's
Atlantic City, Inc.; Marina Associates; Holiday
Corporation; the Promus Companies Incorporated; and
Embassy Suites, Inc., Louis Walter, Appellant in No. 92-5114,
Louis Walter, Lance Walter, individually, as Trustee of the
Testamentary Trust created under the will of Manuel Walter
for the benefit of Toni Walter Stern, and as Executor of the
Estate of Manuel Walter; Toni Walter Stern; the Walter
Company; a California general partnership; Herbert
Sturman, individually and as Executor of the Estate of
Harvey Fierstein; and Paul Syphus, Appellants in Nos.
92-5146/5147/5152.
 
 Nos. 92-5114, 92-5146, 92-5147 and 92-5152.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 3, 1992.
Decided Feb. 16, 1993.
 Hillel Chodos (argued), Los Angeles, CA, Richard D. Wilkinson, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, Michael Blumenfeld, Fierstein & Sturman, Los Angeles, CA, for appellants.
 Ronald L. Reid, Alston & Bird, Atlanta, GA, Joseph R. Sahid (argued), Stuart W. Gold, Cravath, Swaine & Moore, New York City, Bruce I. Goldstein, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, for appellees.
 Before: SLOVITER, Chief Judge, GREENBERG and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Plaintiffs are several individuals and a corporation who formed a 50-50 partnership with Holiday Inns, Inc. (Holiday) in 1979 to develop and operate Harrah's Marina Hotel and Casino in Atlantic City, New Jersey.[1] In 1981, plaintiffs sold their 49% interest in the partnership to Holiday. In 1983, plaintiffs sold their remaining 1% interest to Holiday. In 1985, four years after the first sale, by which time the hotel/casino complex had become highly profitable, they filed this suit claiming that in the buy-out transaction Holiday committed common law fraud, violated federal securities laws, and breached the fiduciary duty it owed to plaintiffs. After plaintiffs presented their case, the district court granted Holiday's motion for judgment as a matter of law on the breach of fiduciary duty claim. See Walter v. Holiday Inns, Inc., 784 F.Supp. 1159 (D.N.J.1992). At the conclusion of the trial, the jury decided for Holiday on the remaining claims. Plaintiffs appeal.
 
 I.
 FACTS AND PROCEDURAL HISTORY
 
 2
 In August 1978, shortly after New Jersey legalized gambling, the plaintiffs purchased a tract of land with the intent of developing a hotel and casino complex at a marina in Atlantic City. Plaintiffs then created two New Jersey corporations (L & M Walter Enterprises, Inc. and Bayfield Enterprises, Inc.) and had both entities form a general partnership known as Marina Associates. After looking for a suitable partner to develop the casino, plaintiffs sold Bayfield Enterprises to Holiday on January 30, 1979 and entered into a 50-50 Partnership Agreement with the hotel chain. Both parties agreed to make an initial capital contribution of $2 million each to the partnership business.
 
 
 3
 The partners successfully obtained a $75 million loan for the project from Midlantic National Bank, which later advanced an additional $20 million to the partnership. Construction commenced in early 1980 and proceeded at a rapid pace.
 
 
 4
 While the construction of the casino was progressing, the partners executed several documents that defined the nature of their relationship. Pursuant to a Memorandum of Understanding dated June 6, 1980, the partners agreed to advance in equal shares additional capital to the casino on an as-needed basis to cover project development (pre-opening) or operating (post-opening) cash shortfalls. If one partner was unable to meet its share, the other could advance the funds and then serve a written "cash call" letter on the non-contributing partner. The Memorandum provided that a failure to comply with a strict timetable for repayment of the cash call would result in a dilution of the non-contributing partner's interest in the casino, with the degree of dilution linked to the total amount of the cash call. The conditions for relief from dilution because of failure to meet a project development cash call were more formidable than those for an operating cash call.
 
 
 5
 A second Memorandum of Understanding dated June 20, 1980 set forth how the casino was to be managed. The day-to-day operations were turned over to Harrah's, Inc., a subsidiary of Holiday. The more important management and financing decisions remained with the partnership's Executive Committee, which was composed of two Holiday executives and two of the plaintiffs, Louis Walter and Lance Walter. The Executive Committee's decision-making power included, inter alia, overseeing the completion of the casino's construction and development, approving capital expenditures for replacement and expansion that exceeded 4% of total revenues for any year, the creation of long-term debt, and the creation of short-term debt for working capital in excess of $2 million.
 
 
 6
 The hotel and casino complex opened its doors to the public on November 22, 1980, before all of the construction was completed. However, construction costs rose substantially over budget, and financial concerns mounted. At a meeting of the Executive Committee in January 1981, the plaintiffs were presented with financial projections for the casino. Walter Haybert, the Chief Financial Officer of Marina Associates, presented "a 'worst case' projection of profit and loss for 1981 with related projections of monthly cash flow." Minutes of meeting, App. at 28007. He explained the need to substantially supplement working capital in the project development budget.
 
 
 7
 Shortly thereafter, two separate cash call letters were issued formally demanding that plaintiffs make equity contributions to the project. The first letter advised that an equity contribution of $18.8 million was required to cover expenditures in connection with the project development budget (plaintiffs' half being $9.4 million). The second letter, which cited Marina Associates' negative cash flow, was a call for cash increments due from November 1980 to May 1981 totaling $15.7 million (plaintiffs' share being $7.85) to cover operating shortfalls for the project.
 
 
 8
 Plaintiffs determined not to supply their share of the funds requested, allegedly relying on Holiday's pessimistic predictions about the financial prospects of the Marina. As a result, Holiday advanced its own funds to cover the shortfalls, and plaintiffs' partnership interest was diluted pursuant to the formula specified in the partners' prior agreements.
 
 
 9
 At the same January 1981 Executive Committee meeting, the partners also approved an Information Flow Agreement that specified the items of partnership financial data, such as financial statements and internal audit reports, that would be provided to the plaintiffs.
 
 
 10
 The financial situation presented at the January 1981 Executive Committee Meeting apparently precipitated plaintiffs' efforts to sell their interest in the casino to outside investors. However, there is some evidence in the record that in 1980 plaintiffs had approached Holiday and others to purchase plaintiffs' partnership interest. After the January 1981 meeting, negotiations with Holiday resumed at plaintiffs' request. They continued until the parties agreed on the terms of a buy-out on May 9, 1981, whereby Holiday agreed to acquire plaintiffs' 49% interest in the partnership for payments to plaintiffs of $1.75 million per year for twenty years, which plaintiffs calculate had a present value of $10.9 million. In July 1983, plaintiffs sold their remaining 1% interest to Holiday for an additional $1.8 million.
 
 
 11
 Sometime after the 1981 buy-out, the casino became a profitable enterprise. Under New Jersey law, the casino's profits and losses were a matter of public record and plaintiffs implicitly concede that they were aware of the highly profitable operations of Marina from 1982 to 1984. Nevertheless, plaintiffs did not challenge the buy-out transaction until this suit was brought in 1985. In that period, they sold their remaining 1% interest to Holiday and continued to do business with Holiday elsewhere. Louis Walter claims he was prompted to file this action by a newspaper article in which Donald Trump, the owner of another casino, suggested that Holiday had taken advantage of the plaintiffs in connection with the 1981 buy-out.
 
 
 12
 Plaintiffs filed this suit against Holiday on October 7, 1985. Although the complaint refers to "defendants fraudulent misrepresentations and concealment of material facts and ... breach of fiduciary duties owed to plaintiffs," the essence of plaintiffs' claims is that Holiday failed to provide them with certain information that they needed to negotiate the buy-out transaction from an equal position with Holiday. They also assert that Holiday had designed a "cash call strategy" to force the buy-out on terms unfavorable to plaintiffs.
 
 
 13
 Nearly six years of pre-trial discovery followed the filing of the complaint. Some of that time was spent on motions relating to the production of almost 200 documents that Holiday claimed were protected by the attorney-client or work-product doctrine privilege. Inexplicably, Holiday's motion for a protective order was under submission to the Magistrate Judge for three and one half years, and plaintiffs did not receive the documents until the spring of 1991.
 
 
 14
 A jury was empaneled in September 1991. After plaintiffs rested their case-in-chief, Holiday moved for judgment as a matter of law on all claims. The district court granted Holiday's motion with respect to the claims for breach of fiduciary duty, rescission, and punitive damages. The court first rejected Holiday's attempt to shield itself behind the corporate veil. The court held such a defense would be an injustice. The court then determined that rescission was unavailable not only because the status quo could not be restored in light of the lapse of time and Holiday's infusion of $24.8 million of capital and $215 million for maintenance and upgrading of the facility, but because an adequate remedy of damages was available. 784 F.Supp. at 1166. As to the fiduciary duty claim, the district court noted the "tense, if not hostile, environment between the parties," id. at 1168, and concluded based on dictum in Fravega v. Security Savings & Loan Ass'n, 192 N.J.Super. 213, 469 A.2d 531 (Ch.Div.1983), questioning the application of a fiduciary standard "to transactions where the relationship between the parties is, by nature, adversarial," id., 469 A.2d at 536, that New Jersey would apply a limited "adverse interest" exception when "partners are dealing with one another at arms length." Walter, 784 F.Supp. at 1170. The court thus concluded that "[g]iven the environment in which the parties were operating, it seems clear that traditional notions of fiduciary duty were inapplicable." Id. at 1168.
 
 
 15
 The court held, however, that even assuming arguendo that a fiduciary duty existed and was breached, judgment as a matter of law for Holiday was appropriate because plaintiffs had failed to prove that the alleged misstatements and omissions would have been material to their decision to sell their partnership interest or that they would have relied on the non-disclosed information. Id. at 1172. This conclusion notwithstanding, the court denied Holiday's motion for judgment with respect to plaintiffs' common law and securities fraud claims. Id. at 1180.
 
 
 16
 Holiday rested without presenting any evidence. The matter was submitted to the jury in the form of special interrogatories. The jury found every issue in favor of Holiday: that it made no material misrepresentations prior to the buy-out; that it did not have any intent to defraud plaintiffs; that there was no reasonable reliance by plaintiffs; that at the time of the buy-out, plaintiffs received fair value; that plaintiffs failed to exercise due diligence; and that plaintiffs assumed the transaction was valid after they discovered the truth about Holiday's alleged misrepresentations.[2]
 
 
 17
 The district court entered final judgment on January 27, 1992 for Holiday based on the jury's verdict. We have jurisdiction under 28 U.S.C. § 1291 (1988).[3]
 
 II.
 DISCUSSION
 A.
 Asserted Fiduciary Duty
 
 18
 Plaintiffs raise a plethora of issues on appeal, many going to the details of trial and pre-trial management. We have determined that these contentions do not require extended discussion, and focus instead on the heart of this case--the nature of the obligations, if any, owed by Holiday to plaintiffs in connection with the negotiations leading to Holiday's buy-out of plaintiffs' interest.[4]
 
 
 19
 Plaintiffs contend that the district court erred in granting judgment for Holiday as a matter of law on plaintiffs' claim of breach of a fiduciary duty because the court interpreted New Jersey law as recognizing an "adverse-interest" exception to the fiduciary duty between partners in the buy-out context. We exercise plenary review of the district court's grant of a motion for judgment as a matter of law (formerly a directed verdict). Tait v. Armor Elevator Co., 958 F.2d 563, 569 (3d Cir.1992). Such a motion should be granted only if, "viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." Indian Coffee Corp. v. Procter & Gamble Co., 752 F.2d 891, 894 (3d Cir.), cert. denied, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985).
 
 
 20
 Although judgment as a matter of law should be granted sparingly, "federal courts do not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir.1978) (citation omitted) (quotation omitted).
 
 
 21
 Plaintiffs argue that the majority of state courts, including New Jersey, have held that fiduciary principles apply with full force during partnership buy-out transactions. See, e.g., Hansen v. Janitschek, 57 N.J.Super. 418, 154 A.2d 855, 857 (App.Div.1959), rev'd on other grounds, 31 N.J. 545, 158 A.2d 329 (1960); Gilbert & O'Callighan v. Anderson, 73 N.J.Eq. 243, 66 A. 926, 926 (N.J.Ch.1907); Nicholson v. Janeway, 16 N.J.Eq. 285, 288 (N.J.Ch.1863); see generally Jeffrey F. Ghent, Annotation, Partner's Breach of Fiduciary Duty to Copartner on Sale of Partnership Interest to Another Partner, 4 A.L.R. 4 th 1122 (1981) (collecting cases recognizing fiduciary relationship). Plaintiffs ask us to predict that the Supreme Court of New Jersey would reject the dictum in Fravega and would align itself with this majority rule.
 
 
 22
 Plaintiffs also ask us to decide which party bears the burden of proof when such inter-partner transactions are alleged to be infected by fraud, another unsettled issue in New Jersey. Compare Farrington v. Harrison, 44 N.J.Eq. 232, 15 A. 8, 9 (1888) (administrator of estate of deceased partner who sold partnership interest to surviving partner bears burden of proof) with Gilbert, 66 A. at 926 ("burden is upon the defendant to establish the fact that he performed his full duty" by "mak[ing] a full and complete disclosure of the condition of the business" to purchasing partner).
 
 
 23
 Although the existence of persuasive authority supporting the application of fiduciary principles even when partners act as adversaries makes it likely that Fravega was too slender a reed on which to decide this case, we need not engage in the difficult predictive function of state law that diversity jurisdiction would require if we can base our ruling on a more settled ground.
 
 
 24
 Since the mid-19th century, New Jersey courts have recognized that in order to set aside the sale of a partnership interest on the ground of breach of fiduciary duty, "it is essential that the misrepresentation or concealment should be ... in regard to a fact material to the contract." Nicholson v. Janeway, 16 N.J.Eq. at 288; see also Hansen v. Janitschek, 154 A.2d at 857. The district court's alternate basis for its grant of Holiday's motion for judgment as a matter of law was that Holiday did not withhold or misstate any material facts. Even if Holiday had some fiduciary obligation to plaintiffs and Holiday had the burden of proving that this duty was not breached, if the evidence plaintiffs produced at trial showed that under the circumstances none of the alleged misstatements or omissions would have been material to their decision to sell their partnership interest to Holiday or that Holiday had no obligation to do more than it did, we must affirm.
 
 B.
 Applicable Legal Principles
 
 25
 Materiality cannot be determined in a vacuum. In business transactions, what is material must be evaluated in the context in which the statements or omissions occurred. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (omitted fact is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder") (emphasis added). This is true as well in partnership buy-outs. 2 Alan R. Bromberg & Larry E. Ribstein, Bromberg and Ribstein on Partnership § 6.06, at 6:64 (1988) (in partnership buy-out transactions, "[e]ven if a partner was subject to a duty of full disclosure and failed to disclose every fact in connection with a particular transaction, there is no liability unless the nondisclosed facts were such as might be expected to have induced action or forbearance by the other partners--that is, were material").
 
 
 26
 As a general proposition courts and commentators have recognized that in determining whether a fiduciary duty has been breached by a material misstatement or by a failure to disclose a material fact, the sophistication of the complaining partner and the degree of access to partnership records are key factors to be considered. See, e.g., Burke v. Farrell, 656 P.2d 1015, 1017 (Utah 1982) (although selling partner did not disclose value of partnership interest, no breach of fiduciary duty where acquiring partner had "ample access to information about the value of his partnership interest" and had "ready access to the records of the partnership"); Coleman v. Lofgren, 593 P.2d 632, 633, 635-637 (Alaska 1979) (where purchasing partner "at all times had access to the partnership records," seller of partnership business did not breach fiduciary duty owed to purchasing partner where seller failed to disclose insolvency of business, even though purchaser relied on seller to inform him of partnership affairs); Cardoner v. Day, 253 F. 572, 573, 577-80 (D. Idaho 1918) (where selling partner alleged that purchasing partner made "false representations ... as to the condition of the [partnership] property and its future prospects," court found no breach of fiduciary duty where plaintiff, a sophisticated businesswoman with knowledge of the mining industry, received "monthly statements" from the partners and where the books and records of the business "were at all times accessible and open to the plaintiff"), aff'd sub nom. Wilson v. Day, 260 F. 788 (9th Cir.1919).
 
 
 27
 As leading commentators in the law of partnerships have stated, "The extent of the duty to disclose depends on the circumstances of the individual case ... [and] may depend on the degree to which the parties have access to accurate financial records, on whether the nondisclosing partner managed the business and thus was familiar with the relevant information, and on the knowledgeability or degree of expertise of the party to whom the duty of disclosure is owed." 2 Alan R. Bromberg & Larry E. Ribstein, Bromberg & Ribstein on Partnership § 6.06, at 6:64 (1988) (citation and footnote omitted); see also id. § 6:05, at 6:55-56 ("[I]f the partners have equal access to the books, and if full information is disclosed in them, they may be bound by interpartner transactions even without direct disclosure."); 59A Am.Jur.2d Partnership § 441, at 463 (1987) ("even ... blatant misconduct [by a partner] does not always constitute a violation of the duty sufficient to afford relief--especially where the alleged wrongdoer is not in a position of dominance, management, or control") (footnote omitted).
 
 
 28
 The plaintiffs stipulated that at the relevant times "each of the plaintiffs was a highly sophisticated and experienced investor," App. at 32,500, and the record amply bears that out.[5] In light of this concession we need only examine the extent of plaintiffs' access to the partnership records.
 
 
 29
 Plaintiffs contend that they were passive partners while Holiday was the managing partner with exclusive control over all financial information concerning the casino. If that were in fact the case, we believe that New Jersey would hold Holiday to a more stringent fiduciary standard in connection with the buy-out than if the partners bargained from equal positions. See Kunsuvo v. Netzke, 91 N.J.Super. 353, 220 A.2d 424, 432-33 (Ch.Div.1966) ("The demands of [a] fiduciary relationship are especially pertinent and precise where one partner in exclusive control of the management of the firm's business assumes to purchase the interest of his co-partner."); Hansen, 154 A.2d at 857 (in partnership buy-out between family members, "where one party, having superior knowledge, misrepresents material facts to another, or fails to reveal material facts which he is under a duty to reveal, ... such conduct constitutes fraud which will move a court of equity to grant relief") (citation omitted). However, we find insufficient evidence in the record to support plaintiffs' factual assertion, even viewing the facts in the light most favorable to the plaintiffs.
 
 
 30
 Those portions of the record that plaintiffs have cited to support their claim of passivity reveal that although the day-to-day operations of the casino were under Holiday's control through its subsidiary, Harrah's, Inc., the most important decisions regarding the planning and financial management remained with the partnership's Executive Committee on which plaintiffs served equally with defendants. For example, although plaintiffs note letters from Holiday executives referring to Harrah's as the managing partner of Marina Associates, these simply reiterate the terms of the June 20, 1980 Memorandum of Understanding setting forth the division of responsibility between the Executive Committee and Harrah's. Holiday does not deny its role in that respect. However, Holiday's management of the daily operations of the casino does not demonstrate that plaintiffs were merely passive partners, as Herbert Sturman testified, or that plaintiffs were not given access to the information necessary to put them in a position where they could bargain fairly in the buy-out transaction.
 
 
 31
 The documents and testimony cited by Holiday overwhelmingly demonstrate the active role played by plaintiffs in every aspect of the partnership's business. See, e.g., App. at 32,498-99 (Appellant Louis Walter's involvement in land acquisition, development, financing, and operations); App. at 29,693-826 (reflecting Louis Walter's role in the construction process). This active involvement continued throughout the Spring of 1981, when the parties were negotiating the buy-out. For example, at the final meeting of the Executive Committee on March 18, 1981, Louis Walter approved certain change orders relating to the casino's remaining construction needs, and Herbert Sturman discussed and approved a procedure for accounting for the operating and project development shortfalls.
 
 
 32
 The record also shows that plaintiffs requested and received volumes of financial data pursuant to the Information Flow Agreement that provided them with ample data by which to assess the partnership's financial situation. See App. at 30,199-264 (monthly financial statements from November 1980 to May 1981 containing balance sheets of income and expenses and noting changes in casino's net assets and working capital); App. at 30,417-42 (monthly internal audit reports from September 1980 to May 1981); App. at 30,265-416 (general manager's reports and flash revenue reports for the same period); App. at 31,177-246 (periodic applications for advances against balance of $95 million Midlantic loan).
 
 
 33
 In fact, plaintiffs' access to the partnership's records was specifically assured by Section 5.1 of the 1979 Partnership Agreement which states:
 
 
 34
 The Partnership will at all times maintain, at the Hotel, complete and accurate books of account.... Such books and records shall be made available for inspection and copying by the Partners, or their duly authorized representatives, during business hours.
 
 
 35
 App. at 27,700.
 
 
 36
 Plaintiffs produced no evidence that they were ever denied access to any information on the casino's past or present financial situation. On the contrary, there is evidence that they were specifically notified that their independent auditors could examine the partnership records. Edward Ellis, Holiday's General Counsel, wrote to Herbert Sturman on March 5, 1981, two months before the buy-out, stating "[y]ou are welcome to come in and audit the books anytime.... Tell us what you want, when you want it and how you want it and we will do our best to comply." App. at 28,248.
 
 
 37
 The relevant evidence was summarized by the Magistrate Judge as follows:
 
 
 38
 In his deposition testimony ... Mr. Sturman admitted that Mr. Ellis advised him that he could have unlimited access to any financial books and records of Marina Associates that he wanted to review. Mr. Sturman also testified that he never thereafter went to Atlantic City to review those records.... Plaintiff Louis Walter also acknowledged during his deposition that he ... had a right to obtain access to any financial information that he wanted to see, that he knew that he would have gotten it, and that he did not do it. Mr. Louis Walter also testified that he had never been denied any information that he requested.
 
 
 39
 App. at 1495.
 
 
 40
 Holiday refers us to unrebutted evidence produced by plaintiffs in their case-in-chief demonstrating plaintiffs' open access to all relevant financial records of the operation of the casino. We therefore proceed on the basis that plaintiffs had unrestricted access to all past and current information regarding the partnership and its financial operations.
 
 
 41
 This case is similar to that considered by the court in Reed v. Robilio, 273 F.Supp. 954 (W.D.Tenn.1967), aff'd, 400 F.2d 730 (6th Cir.1968), where plaintiff claimed that the defendants breached their fiduciary duty to the executor of plaintiff's father's estate by failing to disclose certain facts during the negotiations leading up to the sale by the executor of the partnership interest. The defendants provided the executor with a financial report of the partnership's affairs, along with the annual audit reports of the firm for the five years preceding the buy-out. In addition, the representatives of the estate were invited to personally inspect the firm's books, records, and assets, and were told that the firm's employees were directed to answer any questions and furnish any information sought by the estate. The executor decided that it had all of the information which it needed to evaluate the partnership interest and inquired no further.
 
 
 42
 The district court, applying Tennessee law, concluded that the executor could have ascertained information about good will, consumer acceptance and demand, and the quality of personnel from examining the financial reports. As to plaintiffs' argument that the executor was not given information on the possible growth of the firm, the potential earning future of the business, and trends in the industry, the court recognized that these facts could not have been derived from examining the partnership records. Nonetheless the court stated:
 
 
 43
 [A]ssuming that the matters which were allegedly not disclosed by [the defendants] were material, no breach of faith has been shown. The estate was not represented by an ignorant widow. Rather, the executor ... was the Union Planters National Bank of Memphis ... [which] had been the recipient of [the partnership's] banking business for over thirty years. From the resources at the Bank's disposal, the ... defendants were entitled to act on the assumption that the bank was well versed with respect to all material aspects of the partnership business.
 
 
 44
 Id. at 962-63. The Sixth Circuit affirmed the district court's conclusion that the defendants "did not breach any fiduciary duty ... by [their] failure to disclose any material fact bearing on the value of [plaintiff's partnership] interest." Reed v. Robilio, 400 F.2d 730, 735 (6th Cir.1968). We find the court's analysis in Reed to be persuasive and directly apposite to the facts of this case.
 
 
 45
 With these general principles in mind, we proceed with an item by item analysis of the specific facts that plaintiffs claim would have been material to their decision to sell their half share of the casino to Holiday. We do so mindful of our prior assertion that "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 (3d Cir.1989) (citation omitted).
 
 C.
 
 46
 The Alleged Misrepresentations and Nondisclosures
 
 1. The Boxer Report
 
 47
 Plaintiffs have devoted considerable argument to Holiday's failure to provide them with copies of the financial projections contained in the Boxer Report. The Report, prepared prior to the 1981 buy-out, was a 35 year financial forecast prepared by the defendants, based on the current financial statements and projected growth, which projected large cash flows and high profits for the hotel/casino project. It also contained two ten-year projections of substantial, albeit differing, profits.
 
 
 48
 To support their assertion that this was an omission material to their buy-out decision, plaintiffs point to Sturman's testimony that "the Holiday projections would have been very, very meaningful to me[.] I would recognize that it is a projection but it would have been the best guess of a very sophisticated gaming entity and ... so I would have given them some credibility." App. at 21,040.
 
 
 49
 The issue of the materiality of financial projections has arisen primarily in the securities fraud context. As we stated in Craftmatic, 890 F.2d at 642, "[t]he task of determining whether a given omission is material is especially difficult when the plaintiff alleges nondisclosure of 'soft' information ... [which includes] forward looking statements, such as projections, estimates, and forecasts."
 
 
 50
 We enunciated the standard for evaluating the materiality of future projections in Flynn v. Bass Bros. Enterprises, 744 F.2d 978 (3d Cir.1984), which set forth seven factors to be considered by the district court:
 
 
 51
 the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information.
 
 
 52
 Id. at 988.
 
 
 53
 The context in which the Flynn factors evolved is sufficiently analogous to the situation before us to use them to inform our judgment here, and to note that they weigh against the Boxer Report's materiality. In their depositions, introduced at trial by plaintiffs, two Holiday employees testified that the analysis they used to prepare the Reports was a combination of guesswork and wishful thinking infused with personal hunches. These employees also conceded that they had little experience in preparing long-range financial projections. The Report was prepared for the internal use of Holiday executives in negotiating the buy-out, lessening its value as reliable projection which might have been relevant to the plaintiffs. See Panter v. Marshall Field & Co., 646 F.2d 271, 291-93 (7th Cir.) (affirming directed verdict for defendants on securities fraud claim based on omission of five-year income projections "because the projections ... were tentative estimates prepared for the enlightenment of management with no expectation that they be made public"), cert. denied, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).
 
 
 54
 As for the relevance of the Boxer Report to the plaintiffs' decision, nothing indicates that plaintiffs would have placed any greater reliance on the Boxer projections than on the numerous other forecasts that Holiday had previously disclosed or that plaintiffs themselves had prepared through their independent auditors. Herbert Sturman and Charles Solomonson, a senior Vice President and Chief Financial Officer at Holiday, testified to Louis Walter's disdain for financial projections, such as the two 10-year financial projections that Holiday had previously commissioned in the spring of 1979 and which it provided to plaintiffs. Moreover, the Boxer Report was simply a projection based on the volumes of financial information already in plaintiffs' possession. Plaintiffs have not shown why the forecast prepared for them by their independent auditor in June 1980 was not an equally reliable predictor. See App. at 27,835-81.
 
 
 55
 Of course, we recognize that every negotiator would like to have all the information upon which his or her counterpart is proceeding, but that is a far cry from materiality in the legal sense. That depends, instead, on whether plaintiffs had access to the raw data upon which they could make their own projections. The record shows they did.
 
 
 56
 Although our analysis draws on an assessment of materiality from securities fraud cases, the district court's conclusion that the Boxer Report was "immaterial as a matter of law," 784 F.Supp. at 1174, finds ample support in the decisions of other courts of appeals which have held that financial projections are not material under both Rule 10b-5 and common law fiduciary duty principles. See Walker v. Action Indus., Inc., 802 F.2d 703, 709-10 (4th Cir.1986) (failure of corporate directors to disclose financial projections in conjunction with tender offer not material to investors' claim for violation of Rule 10b-5 or breach of fiduciary duty), cert. denied, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987); Starkman v. Marathon Oil Co., 772 F.2d 231, 239-43 (6th Cir.1985) (same, for failure to disclose earnings and cash flow projections), cert. denied, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). In light of the applicable law and all of the evidence presented, we hold that no reasonable jury could have concluded that Holiday's failure to make the Boxer Report available to plaintiffs was a breach of any fiduciary duty owed by Holiday.
 
 
 57
 2. Failure to Disclose 1981 Cash Flow Projection
 
 
 58
 We reach a similar result with respect to plaintiffs' assertion that Holiday failed to disclose a 1981 cash flow projection for the casino that was prepared by Marina Associates and presented to the Gaming Committee of Holiday's Board of Directors in January 1981, an omission not explicitly discussed by the district court. Although Richard Goeglein, an Executive Vice President at Holiday, testified that he believed plaintiffs had been provided with this projection, we conclude, even assuming that this document was withheld by Holiday, that its non-disclosure could not have been material to the buy-out negotiations.
 
 
 59
 Plaintiffs acknowledge that at the March 18, 1981 executive committee meeting they received a forecast with a mid-case projection of $14.1 million in profits for 1981. App. at 28,032, 20,99123, 21,002-03.[6] From this forecast and other financial information, Herbert Sturman admitted that he was able to calculate future cash flows for the casino for 1981. App. at 21,006-15, 21,834-36, 21,846-56. When asked whether there was "any material difference between what you calculated at the Executive Committee meeting and what it says on [the 1981 cash flow projection]," Sturman replied that "the only difference of significance is that [the projection] lays out ... on a month to month basis just how you're standing, whereas I didn't do it on a month to month basis. But on an annual basis its pretty close." App. at 21,861. Later, however, when asked whether he could have made month to month calculations from the information in his possession, Sturman admitted that "had I thought about that I could have done it." App. at 21,863.
 
 
 60
 Sturman's statements demonstrate that Holiday's failure to disclose the 1981 cash flow projection was not a material omission. As with the Boxer Report, it would be unrealistic to require a partner to disclose every internal projection in its possession, particularly when its co-partner had equal access to the partnership records, had received the foundational facts upon which the projection was based, and was sufficiently knowledgeable to develop its own projection from those facts.
 
 3. Transaction Audit Review Group Report
 
 61
 Plaintiffs contend that Holiday failed to disclose its Transaction Audit Review Group Report, which was completed on May 28, 1981. This review was undertaken to establish the reasons for the multi-million dollar project development cost overrun. The Report revealed that mismanagement by casino employees under Holiday's control was a significant cause of the cost overruns that precipitated Marina Associates' cash calls on plaintiffs. Plaintiffs claim that they would have had a stronger negotiating position against Holiday had they known of the Report, and could have resisted Holiday's dilution threats.
 
 
 62
 The district court concluded that the Group's Report was not completed until more than two weeks after the buy-out and, more importantly, that the plaintiffs "have offered no evidence tending to prove that the defendants were aware of the findings but intentionally withheld the results." 784 F.Supp. at 1179. It also noted that plaintiffs were aware of the Group's investigation but failed to investigate.
 
 
 63
 On appeal, plaintiffs point to nothing in the record to refute these findings. In a letter from Ellis to Sturman dated March 5, 1981, responding to Sturman's complaints about the cash calls and reiterating the availability of the books for plaintiffs' examination, Ellis specifically advised Sturman that there was a pending inquiry. He stated "[w]e have been conducting an audit of the construction phase of the project development, and of course that phase is not over yet." App. at 28,249. Plaintiffs' complaint about their alleged ignorance of the reasons for the high expenses in the construction phase is remarkable in light of the record evidence of Louis Walter's day-to-day involvement with the construction process. See 784 F.Supp. at 1163-64, 1180. Plaintiffs have pointed to nothing to the contrary. Notably, Louis Walter was available to testify, but did not. Apparently, he also did not provide information to the Audit Review Group which sought to interview him. See App. at 28,249.
 
 
 64
 Even if we infer, as plaintiffs ask us to do, that the study and analysis were done before the buy-out, plaintiffs had the opportunity to discover the relevant facts regarding the cost overruns but failed to avail themselves of this opportunity. Thus, they have no basis to complain that the Report was not provided to them when it was completed after the buy-out.
 
 
 65
 4. The $3.087 Million Balance of the Midlantic Loan
 
 
 66
 Plaintiffs also argue that Holiday failed to disclose that Midlantic Bank had waived the holdback provision in the loan agreement, allowing the partnership to draw upon the $3.087 million balance and reduce the amount of the cash calls. In fact, the district court found that there was no material misrepresentation because, irrespective of Midlantic's position in January 1981 regarding waiver of the holdback provision, the bank was unwilling to proceed with the waiver when it discovered the troubled financial condition of the casino.
 
 
 67
 In their brief, plaintiffs have not pointed to anything in the record to refute the fact that in February 1981 Midlantic in fact rejected Holiday's request to advance the balance of the loan for financial reasons. Indeed, they concede that Holiday did not draw down the loan until after the buy-out. In light of the absence of any evidence that Midlantic was willing to waive the holdback at a time when it could have been useful to plaintiffs, there was no material failure to disclose.
 
 
 68
 5. Midlantic's Interest in Refinancing the Casino
 
 
 69
 Plaintiffs also assert that at the March 18, 1981 Executive Committee meeting, Holiday misrepresented that Midlantic was not interested in refinancing the loan. They allege that William H. Placke, a Midlantic Executive Vice President, had met with Holiday executives officials several days before the meeting and expressed an interest in refinancing. This claim is belied by Placke's testimony that the Bank was aware of the multi-million dollar cost overruns in the casino's budget and that it would only "consider [refinancing] once we got our arms around the magnitude of the [project's] potential shortfall." App. at 17,934. Plaintiffs have failed to point to anything else in the record indicating that Midlantic had in fact offered to refinance. Thus, as with the prior alleged omission, there was no material failure to disclose.
 
 6. Cash Calls
 
 70
 Plaintiffs place considerable importance in what they have labeled Holiday's "cash call strategy." According to plaintiffs' view of this purported scheme, Holiday intended to force a buy-out of plaintiffs' interest on unfavorable terms by inflating the cash calls made to plaintiffs, thereby threatening them with dilution of their interest in the partnership. As evidence for this claim, plaintiffs point to Holiday's stipulation that after the buy-out Holiday advanced only $24.8 million to the casino rather than the $34.5 million figure that appears in the two cash call letters. This does not constitute evidence of any purported scheme to inflate the cash-calls. Even if we assume that notes made by some Holiday executives reveal a desire on the part of certain Holiday employees to utilize the cash calls as a tool for negotiating the buy-out, plaintiffs have not pointed to evidence that those in control of Holiday acted on this basis. As the district court noted, plaintiffs "did not produce testimony of those charged with the oversight responsibility for the actual construction of the hotel/casino or those who created the figures for the cash calls, including Walter Haybert, who was the Chief Financial Officer of Marina Associates." Walter, 784 F.Supp. at 1178. Nor have they pointed to evidence that Holiday officials induced anyone at Marina Associates to inflate artificially the cash calls contained in the January 1981 letters.
 
 
 71
 We note that the cash call letters sent to plaintiffs in January 1981 were based on a projection of future needs for funds. The letters specifically stated that the capital contributions for project development shortfalls were based on then-current estimates. With respect to operating shortfalls, the letters set forth a timetable indicating the dates on which funds were to be contributed by the partners for shortfalls occurring through May 1981. Thus, plaintiffs were on notice that it was projected that the need for some of the funds would arise in the future, and Sturman so testified.
 
 
 72
 Plaintiffs complain that Holiday failed to modify the cash calls as projected in the letters when and as it received updated information concerning the project's cash flow. They point to a letter from Sturman dated February 4, 1981 requesting Holiday to "keep[ ] us abreast as to if and when additional funds are needed for post-opening shortfalls." App. at 28,195. The evidence in the record shows that although the cash calls were not reversed, plaintiffs were kept advised as facts changed.
 
 
 73
 At the March 18, 1981 Executive Committee meeting, plaintiffs received a document entitled "Advances to Marina Associates" which set forth in detail the operating and project developments shortfalls that had actually occurred through that date. From this information, plaintiffs could readily determine that the shortfalls were not as high as had been anticipated. For example, although the cash call letter predicted an operating shortfall for January 1981 of $3.1 million, Sturman conceded at trial that the document distributed to plaintiffs at the meeting stated that the shortfall for that period was in fact $2.65 million.
 
 
 74
 Similarly, on April 3, 1981 Ellis sent a letter to plaintiffs stating that the capital required to cover operating shortfalls for February was only $1.95 million, as contrasted with the $3.4 million stated in the cash call letter. By examining all of the information contained in these two documents, plaintiffs knew or should have known before the buy-out that Holiday had advanced $20.6 million to cover both partners' shares of the shortfalls, substantially less than the original projections in the cash call letters anticipated would be needed by that time. Thus, plaintiffs were on notice from the supplemental information Holiday provided that the actual cash required would probably be in line with the $24.8 million dollars Holiday ultimately advanced.
 
 
 75
 There are other compelling facts in the record to support the district court's conclusion that no material misstatements were made by Holiday in connection with the cash calls. Although plaintiffs were dubious of the amount of cash called for in the letters and specifically requested that Holiday permit them to audit the partnership records, they failed to conduct the audit. In a letter dated February 25, 1981 to Philip Satre, Vice President, General Counsel, and Secretary of Harrah's, Inc., Herbert Sturman stated that:
 
 
 76
 The numbers involved from both a pre-opening standpoint and a post-opening standpoint are substantial. We cannot agree as to the propriety of these numbers at this point in time. We have merely been provided with your request to advance funds and have not received any of the necessary supporting financial data.
 
 
 77
 In order to be properly informed, we believe that it would be prudent and in the best interests of all concerned if L & M Walter Enterprises, Inc. were to avail itself of the provisions of Section 5.1 of the [1979 Partnership Agreement]. Thus, you are hereby advised that L & M Walter Enterprises, Inc. desires to have its independent auditors review all books and records from date of inception to date hereof. We wish to do same in the immediate future. We would, therefore, appreciate your contacting the undersigned in your capacity as Managing Partner so that the mechanics of our audit can be finalized.
 
 
 78
 App. at 23,242-43. In response, Edward Ellis specifically invited plaintiffs to "come in and audit the books anytime," App. at 28,248, and stated:
 
 
 79
 You have two people on the Executive Committee and you and Louis [Walter] and others from your group are in Atlantic City frequently if not almost continuously. You have never been denied any information, even though the agreements do not provide for information to be given in connection with a call for funds.
 
 
 80
 The calls for funds were made because the joint venture does not have funds with which to meet its obligations. If there is any doubt about that, all you have to do is check the bank accounts of the joint venture. You cannot in good faith dispute the need for funds or the magnitude of the need, since you and your people are intimately familiar with the project development shortfall and the operating shortfalls.
 
 
 81
 App. at 28,249.
 
 
 82
 Ellis's invitation notwithstanding, plaintiffs never made the promised audit that would have informed them of the factual basis for Holiday's requests. Had they done so they would have discovered what Holiday had already informed them: that the contributions required of the partners was substantially smaller than the projections contained in the cash call letters. Even without such an inspection, plaintiffs knew that a portion of the shortfalls were no longer projections but immediate demands for cash, yet they refused to advance any additional funds to cover their share of the shortfalls. In light of plaintiffs' failure to discover facts that were placed at their call, their breach of fiduciary duty claim against Holiday on this ground must fail as a matter of law.
 
 7. Holiday's Interest in the Buy-Out
 
 83
 Plaintiffs claim that Holiday's professed lack of interest in purchasing their half of the partnership was a material misstatement. They assert that Holiday informed them it had no desire to maintain the casino and that it continued to fund the project only to protect its credit rating and business reputation. App. at 20,985-86 (testimony of Sturman); App. at 21,228 (testimony of Lance Walter). They claim that they relied on Holiday's assertions in reaching their decision to sell their interest to Holiday.
 
 
 84
 The record does not support plaintiffs' claim. According to Sturman's notes of a January 7, 1981 telephone conversation between Lance Walter, Herbert Sturman, and Edward Ellis, both Walter and Sturman
 
 
 85
 suggested to Ed [Ellis] that the most expeditious way of handling the situation would be a buy-out of L & M Walter Enterprises, Inc. by [Holiday]. We all (including Ed) acknowledged that Mike Rose [the President of Holiday] was not in a present frame of mind to do a buy-out. Accordingly, we determined that if we could create some sort of an option for [Holiday], it might solve some of the problems....
 
 
 86
 Ed advised that before we pursue the option idea, he felt that he should be in contact with Mike Rose. Ed called me back today and advised me that Mike Rose was interested.
 
 
 87
 App. at 31,427-28 (emphasis added); see also App. at 32,370-71 (Ellis' memo to file concerning same conservation). Thus, Sturman's own notes contradict his statement at trial that Holiday was uninterested in the transaction.
 
 
 88
 Even assuming that Holiday in fact expressed a lack of interest in the buy-out, we fail to see how this fact could have been relevant to plaintiffs' negotiations with Holiday. At least one court has held that a partner's intention in executing a buy-out is irrelevant provided that it has made all material disclosures to its co-partner. See O'Brien v. O'Brien, 294 Ky. 793, 172 S.W.2d 595, 601 (1942) ("Although the motives of the [selling partners] may have been bad and their intention evil, if in fact their agents made a full and true disclosure[,] the case must be determined by what they did and not by what they intended to do."), cert. denied, 321 U.S. 767, 64 S.Ct. 518, 88 L.Ed. 1063 (1944). Because we have concluded that plaintiffs were informed of or had access to all pertinent information concerning the partnership's affairs, plaintiffs' assertions concerning Holiday's intent, even if true, could not have been material as matter of law.
 
 8. Summary
 
 89
 Plaintiffs argue that the district court should have allowed the claim for breach of fiduciary duty to go to the jury, which should have been permitted to draw inferences from the voluminous material they produced. Plaintiffs filed 195 volumes of appendices with this court (a quantum unprecedented in the experience of any of the judges comprising this panel), and then stated the broad proposition in their brief that "a great deal of material information was deliberately concealed from plaintiffs." Appellants' Brief at 13. We have meticulously examined those portions of the record cited and conclude, as did the district court, that the information allegedly concealed was not information to which plaintiffs were entitled. Thus, even if Holiday had the burden of proving that there was not a breach of fiduciary duty, plaintiffs failed to produce the evidence that would have triggered any such breach.
 
 
 90
 We conclude therefore that the record fails to support plaintiffs' argument that Holiday made any material misrepresentations or omitted providing material facts that it had a duty to disclose to plaintiffs. Thus we conclude that the district court did not err in granting judgment as a matter of law on plaintiffs' claim of breach of fiduciary duty.
 
 D.
 Review of Plaintiffs' Remaining Claims
 
 91
 In light of the district court's conclusion regarding materiality, it was not necessary for it to have sent plaintiffs' claims for common law fraud and a violation of Rule 10b-5 to the jury. See Walter, 784 F.Supp. at 1180.[7] If materiality, which is a common requirement of all three of plaintiffs' claims, has the same meaning in all three contexts, the district court could have granted Holiday's motion for judgment as a matter of law on the two fraud claims once it determined that plaintiffs could not sustain their burden of proof with respect to that issue.
 
 
 92
 In our examination of plaintiffs' breach of fiduciary duty claim, we concluded that, viewing the evidence in the light most favorable to plaintiffs, none of the alleged misrepresentations or omissions were material. Neither party has argued that the concept of materiality should vary with the claim asserted. The factual context in which the alleged misstatements or omissions occurred was the same for all the claims, and we see no reason why we should not ascribe the same meaning to materiality for all three claims. Thus, the legal insufficiency of plaintiffs' breach of fiduciary claim in light of the evidence adduced by them necessarily requires a similar conclusion as to their fraud and securities claims.[8]
 
 IV.
 CONCLUSION
 
 93
 For the foregoing reasons, we will affirm the judgment of the district court.
 
 
 
 [1]
 The principal plaintiffs in this case are The Walter Company (formerly known as L & M Walter Company), a general partnership organized under California law, and its general partners, Louis Walter and his son Lance Walter. Lance Walter brings this action in his individual capacity, as executor of the estate of Manuel Walter (Louis Walter's brother and a former general partner of the Walter Company), and as trustee of the testamentary trust created under Manuel Walter's will
 Also named as plaintiffs are Herbert Sturman, an attorney and investor in The Walter Company who sues in his individual capacity and as executor of the estate of his deceased law partner Harvey Fierstein; Paul Syphus, a manager of L & M Walter Enterprises, Inc.; and Toni Walter Stern, Louis Walter's daughter.
 In this opinion, we use the term plaintiffs to refer to the actions of any of these parties except where otherwise noted.
 
 
 [2]
 Specifically, the jury found that plaintiffs had failed to prove (1) "that Holiday misrepresented any presently existing or past facts about the then existing operations or then current financial condition of the Hotel prior to the 1981 buy-out;" (2) "that Holiday misrepresented its best opinion as to the future operations of the Hotel prior to the 1981 buy-out;" (3) "that any alleged material misrepresentation by Holiday resulted from a deliberate and intentional effort to defraud [plaintiffs], or from conduct so reckless that the responsibility attaching to that conduct so reckless that the responsibility attaching to that conduct closely approaches that which attaches to conscious deception;" (4) "that in agreeing to the 1981 buy-out [plaintiffs] relied on any alleged material misrepresentations by Holiday;" (5) "that to the extent [plaintiffs] claim [they] relied on any alleged material misrepresentations by Holiday, such reliance would have been reasonable and justifiable under the circumstances;" (6) "that Holiday's alleged material misrepresentations were a substantial factor in their decision to agree to the 1981 buy-out;" and (7) "that viewed as of the time of the 1981 transaction [plaintiffs] received less than fair value for their interest in the Hotel." App. at 81-86
 In addition, the jury concluded that Holiday had proven by a preponderance of the evidence that plaintiffs failed to exercise due diligence in connection with the 1981 buy-out. It also found that one or more plaintiffs took action which assumed the 1981 transaction was valid after he or they discovered or should have discovered the truth about any alleged material misrepresentations by Holiday. App. at 87-88.
 
 
 [3]
 Plaintiffs filed a timely notice of appeal on February 20, 1992, the caption of which stated: "Louis Walter, et al., Plaintiffs-Against-Holiday Inns, Inc. et al. Defendants" App. at 31. Although this caption was defective for failing to "specify the party or parties taking the appeal," Fed.R.App.P. 3(c); Torres v. Oakland Scavenger Co., 487 U.S. 312, 314, 318, 108 S.Ct. 2405, 2407, 2409, 101 L.Ed.2d 285 (1988); Cruz v. Melendez, 902 F.2d 232, 235-36 (3d Cir.1990), the body of the notice of appeal stated that "plaintiffs, and each of them, hereby appeal from the judgment entered against them," App. at 31 (emphasis added). This reference to the remaining plaintiffs provided sufficient notice to the court and the defendants to determine the precise identity of the parties taking the appeal and cured the defect in the caption. See Adkins v. United Mine Workers of Am., 941 F.2d 392, 397-98 (6th Cir.1991) (although caption contained the term "et al.," court refused to dismiss appeal on jurisdictional grounds where body of the notice of appeal referred to "all of the Plaintiffs"), cert. denied, --- U.S. ----, 112 S.Ct. 1180, 117 L.Ed.2d 424 (1992); Baylis v. Marriott Corp., 906 F.2d 874, 877 (2d Cir.1990) (same)
 
 
 [4]
 Plaintiffs challenge the district court's exclusion from evidence of certain documents obtained from Holiday's files. They also argue that they were prejudiced by the length of time it took to get production of these documents. Although we agree that the more than three year delay in the Magistrate Judge's ruling was unjustifiable, plaintiffs have not shown the type of prejudice by this delay to warrant reversal on this ground because they declined the district court's offer to reopen discovery to develop a proper foundation for admitting the documents into evidence. See In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238, 297 (3d Cir.1983) (where plaintiffs complained that "documents were produced only after discovery was closed, and thus they were prejudiced in their ability to produce foundation evidence," court found no abuse of discretion where plaintiffs "failed to avail themselves of [a pre-trial order] which permitted reopening of discovery for good cause shown") (quotation omitted), rev'd on other grounds, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)
 Similarly, the district court did not abuse its discretion in ruling that the documents could not be admitted unless a witness testified regarding their contents. Such testimony would have been crucial to an understanding of the often illegible notes that comprised the documents themselves or that appeared on the face of other typewritten items. See Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F.Supp. 1190, 1242 (E.D.Pa.1980) ("Plaintiffs should have established the meaning of unclear diary entries through foundational evidence, in the form of testimony or otherwise."), aff'd and rev'd in part on other grounds, 723 F.2d 238 (3d Cir.1983), rev'd on other grounds, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 [5]
 Louis Walter is an experienced developer and operator of hotels. At the time of trial he owned two hotels in California, which he managed as Holiday Inn franchises. He also developed a hotel and casino in Las Vegas, Nevada which was later leased to Holiday and another corporation. Lance Walter, who has a Bachelor of Science and a Master of Business Administration from the University of Southern California, testified that he was actively involved in the Walter Group's search for the optimal location for a hotel and casino in Atlantic City. Herbert Sturman testified that he was the founding partner of his law firm, Fierstein & Sturman, and had been certified by the State of California as a specialist in tax law since 1973
 
 
 [6]
 This estimate proved to be overly optimistic. Actual profits for 1981 were only $1.34 million. App. at 30,475
 
 
 [7]
 The court may have done so as a precautionary measure, and the decision to do so was within its discretion
 
 
 [8]
 Because we conclude that the district court should have granted Holiday's motion for judgment as a matter of law as to all claims, we need not review plaintiffs' allegations of error with respect to the jury charge. See J.E.K. Indus., Inc. v. Shoemaker, 763 F.2d 348, 352 (8th Cir.1985). We also need not consider plaintiffs' objections to the district court's rulings with respect to rescission and punitive damages, which in light of the judgment for Holiday on liability, are harmless. See Bulgo v. Munoz, 853 F.2d 710, 716 (9th Cir.1988) (any error in district court's decision to direct verdict for defendant on punitive damages claim "could only be harmless" where jury found in favor of defendant on issue of liability); Fluckey v. Chicago & Northwestern Transp. Co., 838 F.2d 302, 303 (8th Cir.1988) (same); Notch View Assocs. v. Smith, 260 N.J.Super. 190, 615 A.2d 676, 683 (Law Div.1992) (rescission denied where "no evidence was presented to prove that any of the[ ] alleged breaches of fiduciary duties damaged, impaired or undermined the partnership"); Davis v. Green, 183 Or. 484, 193 P.2d 1003, 1004 (1948) (rescission denied where selling partner failed to demonstrate that purchasing partner's action were fraudulent or that he was damaged by them)